FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 1 8 2014

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

-----------------------------------------------------------------------------X

KALYN STEPHENS,

                         **Plaintiff,**

          -against-

SULLIVAN & CROMWELL LLP;
LEGAL OPTIONS INC.;

PAUL HASTINGS LLP; PATRICK SHEA, ESQ., an individual;

NEW YORK STATE SUPREME COURT; JUDGE LOUIS YORK,
an individual; NORMAN GOODMAN, ESQ., an individual; HELEN
MULLER, an individual; ROBERT PORTAS, an individual; ANNE
MARIE SCRIBANO, an individual; GLORIA BRANDON, an
individual;

NEW YORK STATE SUPREME COURT APPELLATE DIVISION;
SUSANNA ROJAS, ESQ., an individual;

NEW YORK CITY COMMISSION ON HUMAN RIGHTS;
CARLOS VELEZ, ESQ., an individual; NEW YORK CITY
OFFICE OF CORPORATION COUNSEL; AMY OKEREKE,
ESQ., an individual;

CAPLAN & ROSS LLP; JONATHAN ROSS, ESQ., an individual;
BRIAN CAPLAN, ESQ., an individual; and

DOES 1 through 50, inclusive,

                           **Defendants.**

-------------------------------------------------------------------------X

Case No.

**VERIFIED COMPLAINT**
**JURY TRIAL DEMAND**

**1  14-CV-2659**

**PART 1 of 36**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
------------------------------------------------------------------------------X

KALYN STEPHENS,

                              Plaintiff,                    Case No.

        -against-                                           **VERIFIED COMPLAINT**
                                                            **JURY TRIAL DEMAND**


SULLIVAN & CROMWELL LLP;
LEGAL OPTIONS INC.;

PAUL HASTINGS LLP; PATRICK SHEA, ESQ., an individual;

NEW YORK STATE SUPREME COURT; JUDGE LOUIS YORK,
an individual; NORMAN GOODMAN, ESQ., an individual; HELEN
MULLER, an individual; ROBERT PORTAS, an individual; ANNE
MARIE SCRIBANO, an individual; GLORIA BRANDON, an
individual;

NEW YORK STATE SUPREME COURT APPELLATE DIVISION;
SUSANNA ROJAS, ESQ., an individual;

NEW YORK CITY COMMISSION ON HUMAN RIGHTS;
CARLOS VELEZ, ESQ., an individual; NEW YORK CITY
OFFICE OF CORPORATION COUNSEL; AMY OKEREKE,
ESQ., an individual;

CAPLAN & ROSS LLP; JONATHAN ROSS, ESQ., an individual;
BRIAN CAPLAN, ESQ., an individual; and

DOES 1 through 50, inclusive,

                              Defendants.


------------------------------------------------------------------------------X


        KALYN STEPHENS, Plaintiff, pro se, as for her lawsuit[1] against the law firm Sullivan &

Cromwell LLP and other Defendants alleges, upon knowledge as to herself and otherwise upon

information and belief, as follows:

---

[1] The Lawsuit consists of 36 Parts. Part 1 to Part 6 is the Complaint, and consists of 612 pages. Part 7 to Part 36 is
evidence constituting over 1,200 pages and over 160 Exhibits.

## NATURE OF CLAIMS

1. Kalyn Stephens ("Ms. Stephens"), Plaintiff, brings this action against Defendants to obtain redress for the deprivation and conspiracy to deprive Ms. Stephens of her protected rights under Federal, State and municipal laws as hereafter alleged, and for discrimination on the basis of Religion, Sex, and Race and for Retaliation, Breach of Contract, Fraud, Intentional Infliction of Emotional Distress, and Defamation of Character among other things.

## PRELIMINARY STATEMENT

2. Ms. Stephens worked at Defendant Sullivan & Cromwell LLP ("S&C" or the "Firm" or "Defendant") Manhattan office as a contract attorney from June 2004 to July 2010. Ms. Stephens is a graduate of Boston College Law School, as Sullivan & Cromwell LLP advertised. Upon information and belief, Sullivan & Cromwell LLP is a law firm with annual revenues of over $1 billion. Sullivan & Cromwell LLP repeatedly requested Ms. Stephens to work on assignments and Ms. Stephens worked on numerous matters for the firm's insurance clients and financial services clients, including but not limited to Barclays plc, Goldman Sachs Group Inc, Hanover Insurance Group Inc, Wachovia Corporation, and The Willis Group Holdings plc. However, during Ms. Stephens' work as a contract attorney, Sullivan & Cromwell LLP did not pay Ms. Stephens the compensation it paid its full-time permanent attorneys although Ms. Stephens performed similar work, had worked on special projects, and reviewed and corrected the work of other attorneys whom Sullivan & Cromwell LLP promoted.

3. A contract attorney position is the lowest attorney job classification at Sullivan & Cromwell LLP for which Ms. Stephens was denied the compensation the firm paid to its full-time permanent attorneys. Ms. Stephens applied for a full-time permanent attorney position at Sullivan & Cromwell LLP and was never offered a full-time permanent attorney position. The firm's

permanent full-time attorneys, including Partners, Associates, and Staff Attorneys all had authority over Ms. Stephens, in which they used to her detriment, including but not limited to requesting Ms. Stephens to work on assignments because of her sex and retaliating against Ms. Stephens when she did not acquiesce to their unwanted attention of her.

4.  As a contract attorney at Sullivan & Cromwell LLP, Ms. Stephens was compensated at least 75% less than Sullivan & Cromwell LLP associates whom among them include less experienced attorneys, recent law school graduates, and 25 year old first year associates who are paid a base salary of $160,000 a year and bonuses. In addition, the firm denied Ms. Stephens her own private office, medical benefits, a savings plan, sick leave, flexible work benefits, bar associates dues expenses, and other compensation, as Sullivan & Cromwell LLP advertise on its website. In addition, Sullivan & Cromwell LLP repeatedly retaliated against Ms. Stephens for her complaints of harassment and discrimination, including but not limited to illegally firing Ms. Stephens on July 26, 2010, only two weeks after Ms. Stephens made complaints of sexual harassment and discrimination to Sullivan & Cromwell LLP's Human Resources Department on July 12, 2010, and approximately 7 months before the end of Ms. Stephens' employment contract term.

5.  Defendant's proffered reasons for terminating Ms. Stephens are pretextual as evidenced by the timing of Ms. Stephens' termination and Sullivan & Cromwell LLP's disregard of Ms. Stephens' impressive record throughout her employment with Defendant and Ms. Stephens' opposition to Defendant's discriminatory practices to which she was pervasively subjected. Defendant apologized and terminated at least one of those in its employ responsible for the sexual harassment and retaliation identified in this Complaint.

6.  The sexual, retaliatory, national origin and ethnic harassment, gender and religious discrimination and other discriminatory terms and conditions of employment that Defendants subjected Ms. Stephens to throughout her legal career and beginning in 2004 include, but are not limited to the following: frequent requests for dates; other frequent sexual comments; unwanted and unwelcomed advances; frequent staring; unwanted and unwelcomed comments regarding her

3

clothing and appearance; unwanted and unwelcomed leering at her body; unwanted and unwelcomed physical touching of her person and clothing; frequent probing and asking her personal questions; making threats; yelling at her; insulting her; making unwarranted phone calls to her place of residence; blocking her movement; using physical gestures to intimidate her; searching her personal property; securing personal information about her; pressuring her to waive her legal rights; pressuring her to use illegal dugs; offering her unwanted gifts; thwarting her ability to perform her job duties and responsibilities; constantly pressuring her to abandon her employment; placing her under unwarranted and intrusive surveillance; mocking her Southern accent and mannerisms; excessively monitoring her activities; micromanaging her work; pressuring her to drink alcohol; inappropriately standing and sitting in close proximity to her; exhibiting sexually-focused materials; leveling undue criticisms of her work; changing her work duties; making false accusations about her; leveling unwarranted personal criticisms of her; stalking her; bullying her; terminating her without warning, for pretextual reasons; subjecting her to discriminatory work standards and hours of work; offensive derogatory religious remarks; national origin comments; racial comments; ethnic slurs, epithets and insults, and other discriminatory terms and conditions of employment, and unlawful employment practices.

7.   Plaintiff charges that she has suffered severe and continuing injury, emotionally, financially, and professionally as a result of the acts of harm by the herein below named and fictitiously-named Defendants for which acts of harm Plaintiff seeks substantial punitive damages, compensatory damages, special damages, as well as injunctive relief and declaratory judgment.

## THE PARTIES

8.   Plaintiff Kalyn Stephens ("Plaintiff" or "Kalyn" or "Ms. Stephens") is a Christian African-American female citizen and resident of the State of Georgia and, at all relevant times, licensed to practice law in the State of Georgia.

4

9.  Defendant Sullivan & Cromwell LLP ("Sullivan & Cromwell" or "S&C" or the "Firm" or "Defendant") is a limited liability partnership, which maintains a place of business in New York, as well as other jurisdictions, and transacts business in Georgia. Defendant operates as an international law firm. At all relevant times, Defendant has (a) contracted attorneys through staffing agencies for a fee, including Legal Options Inc., De Novo Legal, and Update Legal pursuant to contracts between itself and the staffing agencies; (b) been a third party client firm; (c) jointly been Plaintiff's employer; (d) benefited financially from Plaintiff's labor; and (e) supervised Plaintiff's work.

10. Defendant Legal Options Inc. ("Legal Options" or "Defendant") maintains a place of business in New York. Defendant operates as a labor service agency. At all relevant times, Defendant has (a) been engaged in the business of employing attorneys to provide services, for a fee, to third party clients, including Sullivan & Cromwell LLP, pursuant to contracts between itself and third party clients; and (b) been Plaintiff's employer.

11. Defendant Paul Hastings LLP ("Paul Hastings" or "Defendant") is a limited liability partnership, which maintains its principal office in California, and transacts business and maintains a place of business in New York, New York and Atlanta, Georgia. Defendant operates as a law firm.

12. Defendant New York State Supreme Court ("State Court" or "County Court" or "Defendant") is a tribunal in the state court system of New York, which maintains a court in New York County, New York.

13. Defendant New York State Supreme Court, Appellate Division ("Appellate Division" or "Defendant") is an intermediate tribunal in the state court system of New York that reviews appeals of the New York State Supreme Court. Defendant operates as an intermediate between the New York State Supreme Court and the New York Court of Appeals, and maintains a court in Manhattan, New York.

14. Defendant New York City Commission on Human Rights ("City of New York" or "Commission" or "Defendant") is a government agency, which maintains an office in New York.

15. Defendant New York City Office of Corporation Counsel ("City of New York Law Department" or "City of New York" or "Defendant") is a government entity, which maintains an office in New York. Defendant operates as a law office.

16. Defendant Caplan & Ross LLP ("Caplan & Ross" or "Defendant") is a limited liability partnership, which maintains a place of business in New York. Defendant operates as a law firm.

17. The full extent of the facts linking the fictitiously designated Defendants with the causes of action alleged herein is unknown to Plaintiff. In addition, the true names, the full names and capacities, whether individual, corporate, government, associate, or otherwise of Defendants DOES 1 through 50, inclusive, ("Defendants") are unknown to Plaintiff, and therefore Plaintiff sues these Defendants by such fictitious names. Plaintiff is informed and believes and therefore alleges that each of said fictitiously named Defendants is in some manner responsible for the events and occurrences herein, and was an actual, proximate, and substantial cause of the injuries to Plaintiff, as herein alleged. Plaintiff prays that when the true names, the full names and capacities of these Defendants are ascertained, they may be inserted herein and in all subsequent proceedings in said action, and that the said action may then proceed against them under their true names, full names and capacities.

18. At all times herein mentioned, the Defendants were and are the agents, servants, employees, principals, officers, directors, partners, representatives, parents, subsidiaries, successor-in-interests, joint-venturers, or co-conspirators of each of the remaining Defendants, and in such capacity participated in the acts or conduct alleged herein.

19. All of the Defendants, including the Doe Defendants, have participated in the furtherance of a civil wrong against Plaintiff as alleged in this Complaint.

20. Whenever and wherever this Complaint refers to any act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

21. Whenever and wherever reference is made in this Complaint to any act by a Defendant and/or

6

Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

22. Whenever and wherever reference is made to individuals who are not named as Defendants in this Complaint but are or were employees/agents of Defendants, or any of them, such references shall be deemed to mean that such individuals at all relevant times acted on behalf of Defendants within the scope of their employment.

23. Plaintiff has suffered serious emotional and economic injuries due to the unlawful discriminatory acts by Defendants. Plaintiff has been diagnosed with adjustment disorder caused by the unlawful harassment, discrimination, and retaliation and has been unable to return to employment. Plaintiff's great emotional distress has caused her to seek care from mental health providers, which she has needed in the past and will continue to need in the future.

## JURISDICTION AND VENUE

24. This is an action arising under the laws of the United States of America, including Title VII of the Civil Rights Act of 1964, as amended.

25. This entire action constitutes a single case which should be heard in a single judicial proceeding.

26. This Court has supplemental jurisdiction over common law and state law claims which are so related to the federal claims in the action that they form part of the same case or controversy.

27. This Court has subject-matter jurisdiction over this action because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds the value or sum of seventy-five thousand ($75,000.00), exclusive of interests and costs.

28. Jurisdiction is proper because Plaintiff resides in the State of Georgia and is within the district of this Court.

29. Jurisdiction over Defendant in New York is proper in this district because Defendant's intentional conduct in New York calculated to cause injury to Plaintiff in Georgia.

30. Jurisdiction is also proper over Defendant by reason of the fact that Defendant transacts business in the State of Georgia.

31. Venue is also proper because in a defamation action, a plaintiff may sue in any jurisdiction where the defamatory remarks are published.

32. All claims for relief set forth in this Complaint arise from a common nucleus of operative facts.

About Plaintiff

33. Plaintiff was born in Atlanta, Georgia. Since Plaintiff was a small child, church always played a major role in her life. Her family is religious and raised her in a conservative home in Georgia.

34. At the age of 19 years old, Plaintiff began working at the United States Attorney's Office for the Northern District of Georgia, where she worked several years with annual pay increases while attending school, and until she began school at Boston College, a Jesuit school, on a scholarship. During school and upon graduation, Plaintiff regularly attended church, where she taught Sunday school.

## FACTUAL BACKGROUND

35. In 2003, Plaintiff notified Hudson Global that she would be relocating to the New York area and would be seeking a career as an attorney in New York City. To that end, Hudson Global arranged an interview for Plaintiff to meet with the law firm of Hughes Hubbard & Reed in Winter 2004. After an interview at the firm's Manhattan Office, Plaintiff was offered a contract attorney position at the firm starting February 2004.

36. Upon arrival at Hughes Hubbard & Reed, Plaintiff began orientation. Steven DiCesare, an associate at the firm and Plaintiff's immediate supervisor, subjected Plaintiff to intense staring. Soon afterwards, Plaintiff discovered that she was assigned to work on the privilege team of a document review project, a team that Steven DiCesare had direct supervision. While working together, Steven DiCesare was very friendly and flirtatious with Kalyn Stephens, Plaintiff. He

8

singled her out several times. In the beginning and during subsequent times, Steven DiCesare approached Plaintiff in her work area, smiled at her, and began non-work related conversations with her. This occurred repeatedly. When Plaintiff did not engage in lengthy conversations with him, Steven DiCesare responded in an angry tone and made abrupt hand gestures, suggesting that he was annoyed with Plaintiff's limited responses.

37. Suspecting that Plaintiff's co-worker whom sat in the work seat next to her and whom occasionally chatted with her had made a disparaging remark about him, Steven DiCesare approached Plaintiff and asked her if the co-worker had made a disparaging remark about him. Steven DiCesare insisted that Plaintiff tell him, which she did not do. Steven DiCesare eventually walked away although angrily.

38. Plaintiff also felt uncomfortable when Steven DiCesare repeatedly followed her onto the elevator. For instance, when Plaintiff was alone in the elevator Steven DiCesare attempted to strike up a conversation with her by telling her about a restaurant that served pizza, suggesting that the food was better than the pizza that he had regularly ordered for the work group. Plaintiff believes Steven DiCesare told her this because he wanted to establish a close relationship with her. Plaintiff regularly ate the pizza that Steven DiCesare had ordered for the office.

39. During another time, Steven DiCesare followed Plaintiff on the elevator and immediately asked her: "Do you drink?" Plaintiff was shocked and offended that she was being asked this in a professional environment. When Plaintiff did not respond to his question, Steven DiCesare immediately asked her in a stern, raised voice: "What do you drink," indicating that he would not be deterred by her disinterest. This was intimidating, demeaning, and unwelcomed to her. Plaintiff quickly exited the elevator to get away from him.

40. After the elevator ride, Steven DiCesare detected Plaintiff's obvious discomfort with him and his actions. He began inviting Plaintiff to lunch with him. He took Plaintiff to lunch, probed her and asked her personal questions.

9

41. As Plaintiff was getting a work assignment, Plaintiff's female co-worker told her that 'They are trying to see who is going to get to you first,' suggesting that the excessive attention of Plaintiff was sexually motivated. Plaintiff believes her co-worker told her this because her co-workers were aware of the excessive and inappropriate attention that Steven DiCesare and Hughes Hubbard & Reed's other supervisors subjected Kalyn Stephens, Plaintiff.

42. For instance, the firm's staff attorney David Paul who occupied a work seat near Plaintiff invited Plaintiff out for drinks after work. Plaintiff declined. Another time, David Paul asked Plaintiff out for drinks again and when she did not acquiesce, he berated her by stating: "Don't you wanna have some fun." Plaintiff found this very abhorrent among other things and did not respond because she did not want to encourage him.

43. On multiple days, David Paul told Plaintiff: "Shep [Steven DiCesare] doesn't know how to hold his liquor." Several times, while speaking to Plaintiff regarding his and other Hughes Hubbard & Reed co-workers' after work activities, David Paul told her, "Marissa drinks until she falls out." This too troubled Kalyn Stephens, Plaintiff. Marissa was a contract attorney as well as Kalyn Stephens, Plaintiff.

44. Although Marissa occupied a workspace in a different work area, she regularly visited David Paul and Steven DiCesare's friend whom sat in the same work area as Kalyn Stephens, Plaintiff.

45. Marissa had missed multiple weeks of work to study for the bar exam. Plaintiff believes that she had been granted this privilege because of the close, personal relationship that she maintained with the supervisors and their friends. Plaintiff was offended by the sexual overtones of the conversations that involved Marissa and the firm employees whom shared a workspace in Plaintiff's work area.

46. For example, Plaintiff was offended when she heard Marissa state that two people were "fucking," suggesting a sexual relationship. This occurred during Marissa's discussion with David Paul near Plaintiff's work area. Plaintiff was also offended when she observed Marissa

10

engage in physical contact with Steven DiCesare's friend and co-worker King by stroking her leg between his legs.

47. Multiple combinations of the firm's employees were or had been sexually involved with colleagues. For instance, contract attorney King married an associate at the firm and eventually moved away with her, one of the contract attorneys whom began working with Plaintiff dated another contract attorney while both worked at the firm. One of the contract attorneys repeatedly expressed an interest in dating David Paul. Plaintiff believes similar conduct was expected of her but she had no interest. Steven DiCesare, and the other supervisors and their friends were very friendly to Kalyn Stephens, Plaintiff. Plaintiff believes this is the reason.

48. Plaintiff also felt uncomfortable when she was taking a break in the Borders bookstore, which was located in a different building. A male co-worker followed her in the bookstore, approached her and asked her the reason she had moved to New York. Plaintiff walked away to escape him.

49. Plaintiff also felt uncomfortable when one of the supervisors whom had transferred from the corporate department to litigation department subjected her to a lot of unwanted attention. For example, the firm's supervisor touched Plaintiff's body with his hand without her consent. This occurred as he was speaking to her.

50. Another contract attorney David complained to Plaintiff that a long-term male contract attorney at the firm and a friend of Steven DiCesare repeatedly invited him to stay the night at his apartment among other things. This too caused Plaintiff to feel uncomfortable. Contract attorney David expressed his discomfort several times to Plaintiff and told her that he had complained to Hudson Global multiple times regarding the inappropriate conduct and that it failed to take appropriate actions. Contract attorney David expressed to Plaintiff that he did not want to return to work at Hughes Hubbard & Reed. Contract Attorney Christina Walsh had also complained to Plaintiff several times regarding the inappropriate conversations that the subject contract attorney engaged in as he sat near her [Christina Walsh's] work area.

11

51. During the times the subject contract attorney visited Plaintiff's work area, he commented that he was aware that Plaintiff was from the Southern part of the country, indicating that he had detected it from her demeanor. Plaintiff was offended when during multiple times, he mocked her Southern accent. The subject contract attorney did not regularly speak with a Southern accent.

52. Sometime after Plaintiff began working at the firm, associate Catherine Meale and Plaintiff's supervisor regularly occupied a work seat next to Kalyn Stephens, Plaintiff. Upon meeting her, Catherine Meale probed Plaintiff and asked her personal questions. She did not subject other employees to this type of attention. Catherine Meale acknowledged in her response that Plaintiff had recently moved to the New York area and had limited acquaintances.

53. In addition, she regularly asked Plaintiff how she spent her weekend. Plaintiff whom regularly attended Sunday service replied: "I went to church." Several of Plaintiff's co-workers were aware of Plaintiff's religious practices because among other things she had also communicated with other co-workers regarding her religious observance. In response to Plaintiff's religious observance, Hughes Hubbard & Reed supervisory attorney Andy, upon information and belief, made a snide remark that people who attend church services do so because of hardships and transgressions.

54. On several occasions, Catherine Meale invited Plaintiff to lunch with her and on other breaks with her. She had also invited herself to take breaks with Kalyn Stephens, Plaintiff. During one of the lunch breaks, Catherine Meale stated in the presence of other associates that Steven DiCesare had "taken over", suggesting that Steven DiCesare exercised excessive authority. Plaintiff believes Steven DiCesare exercised a lot of authority because his mother was an employee of the client, and the client matter was lucrative to the firm.

55. Although Steven DiCesare had a reputation for "chasing the ladies", Hughes Hubbard & Reed failed to stop his abusive actions. Instead, Steven DiCesare and his friend and Staff Attorney David Paul continued to subject Plaintiff to unwelcomed staring of her.

12

56. For instance, when Plaintiff exited her work seat and/or walked in the work area, David Paul and Steven DiCesare ogled at her body. This occurred repeatedly on several days. This caused Plaintiff to feel extremely uncomfortable and she dreaded leaving her work seat. Plaintiff complained to her co-workers. Plaintiff told her co-workers: "They keep staring at my butt [buttock]." Plaintiff's co-worker advised her to report Steven DiCesare and David Paul's offensive and unprofessional conduct to Human Resources.

57. Several times, Catherine Meale's staring at Plaintiff made her feel uncomfortable. She complimented Plaintiff's physique. Plaintiff had hoped that the compliment was a one-time occurrence. However, Catherine Meale's staring at Plaintiff and repeated compliments regarding her body occurred multiple times and it made her feel uncomfortable. Plaintiff also felt uncomfortable when on several occasions she invited Plaintiff out for drinks and to a house party with her, Steven DiCesare and David Paul. Plaintiff declined.

58. Plaintiff complained to her co-worker Lanre Abiola that the firm's supervisors repeatedly invited her for drinks and parties, indicating that she was feeling uncomfortable. Lanre Abiola told Plaintiff that David Paul made an offensive comment to him and that he observed Steven DiCesare watching pornographic images on his computer and making inappropriate comments.

Hughes Hubbard & Reed Retaliates

59. In or around April 2004, when Plaintiff failed to acquiesce to the unwanted and unwelcomed attention of her, she began to receive bad evaluations regarding her work. This occurred when Steven DiCesare approached her and critiqued her work. As Plaintiff reviewed the subject work, Steven DiCesare sat very close to her and stared intensely at her legs. This too caused her to feel uncomfortable.

60. Shortly thereafter, Nikki Scott, a long-term contract attorney at the firm, approached Plaintiff and critiqued her work and began speaking to her in a harsh manner. For instance, while reviewing documents with Plaintiff, Nikki Scott asked her in a condescending manner: "You didn't learn

13

this during orientation?" Nikki Scott did not subject other employees to this type of treatment. Prior to that time period, Plaintiff had not received any complaints about her work.

61. In response to Plaintiff's early arrival to work, David Paul stated: "No freebies here," indicating that Plaintiff should not have been compensated for her early arrivals to work. Since the beginning of her employment, Plaintiff had regularly arrived early for work and had not received any complaints about it.

62. Catherine Meale and the contract attorneys whom she supervised became increasingly hostile to Kalyn Stephens, Plaintiff. For example, when Plaintiff spoke, Catherine Meale without reservation and eagerness responded with unwarranted criticism in often a loud, hostile voice. This occurred repeatedly. This bothered Kalyn Stephens, Plaintiff. Plaintiff complained to her co-worker Christina Walsh. Christina Walsh told her: "She wouldn't speak to me that way," suggesting that she would not tolerate Catherine Meale's hostile conduct.

63. Plaintiff did not observe Catherine Meale treat anyone else with hostility. Catherine Meale continued to pressure Plaintiff to attend after work events.

64. For instance, she asked Plaintiff if she was going to attend Steven DiCesare's birthday party. Plaintiff indicated that she was not. Catherine sarcastically responded, "You didn't see the sign on the bathroom door." Plaintiff succinctly responded: "No." Catherine Meale repeated while shouting at Plaintiff in the presence of the other employees in the work area: "You didn't see the sign on the bathroom door." Plaintiff succinctly reiterated: "No."

65. Marissa, whom was standing in the work area, was staring at Plaintiff with contempt. Also on this day, another contract attorney Jessica began chastising Kalyn Stephens, Plaintiff. On other workdays, Jessica had talked incessantly about non-work related matters in the work area she shared with Kalyn Stephens, Plaintiff. This includes Jessica's conversations involving her dating and kissing her law school professor when she was a student. Plaintiff found her discussions inappropriate and offensive. This is in addition to the rude behavior that another contract attorney subjected Plaintiff on a near daily basis.

14

66. Around this time, staff attorney David Paul repeatedly told Plaintiff that she would have to share her tiny workspace with another employee. Plaintiff complained to his supervisor that she did not want to share her workspace. The conditions became intolerable.

67. Plaintiff found another job and left soon thereafter to work on a document review matter for the law firm of Skadden, Arps, Slate, Meagher & Flom. Plaintiff did not like the working conditions. She sat at a work table in close proximity with several co-workers whom talked excessively regarding non-work related matters. This was distracting to Kalyn Stephens, Plaintiff. In addition, the document review matter was disorganized.

68. Kalyn Stephens felt extremely uncomfortable when a male whom each time attempted to strike up a conversation with her followed her repeatedly on the elevator. Ms. Stephens had no interest and was troubled by this. Less than a week later, Ms. Stephens resigned and went to work for the law firm of Sullivan & Cromwell LLP. No one contacted Ms. Stephens to see why she left the firm.

**Sullivan & Cromwell Discriminates**

69. On or around June 3, 2004, Ms. Stephens began working for the law firm of Sullivan & Cromwell (S&C) at its main office building at 125 Broad Street. Her title was contract attorney, and initial job responsibilities consisted of legal work regarding discovery, such as first level document review for a matter involving the firm's client The Willis Group Holdings plc, a multinational insurance brokerage company with an office at 200 Liberty Street in Manhattan, New York.

70. From the beginning, Ms. Stephens was qualified for her position and did superlative work. Her immediate supervisors Sullivan & Cromwell associate attorney Elana Katcher and Sullivan & Cromwell special assistant litigation assistant Tifhanie Robert complimented Ms. Stephens' work. (At Sullivan & Cromwell LLP, the title "Special Assistant Litigation Assistant" is the equivalent to the title "staff attorney" at other law firms. Therefore, hereafter "staff attorney").

15

71. Within a month of beginning her work on the Willis Group matter, associate attorney Elana Katcher told Ms. Stephens that she was doing a good job and assigned her to perform a second level document review of other contract attorneys' work, a supervisory role usually performed by associates and staff attorneys at law firms. From the beginning, Ms. Stephens performed her new role exceptionally well, and never received a complaint or negative comment about it. In addition, Sullivan & Cromwell copied Ms. Stephens' work product and Elana Katcher distributed several of Ms. Stephens' work product to be used as a model for other attorneys.

### Sullivan & Cromwell Attorneys Harass, Offend, and Intimidate Ms. Stephens

72. At all times and particularly during the Willis Group matter, Ms. Stephens performed her review of other attorneys' work within a case room shared by other Sullivan & Cromwell attorneys, including but not limited to other contract attorneys whom work she was assigned to review.

73. At some point, Sullivan & Cromwell attorney Alain Personna replaced the person whom sat next to Ms. Stephens at the work table and occupied the chair next to Ms. Stephens. When supervisory attorney Tifhanie Robert exited the case room, Alain Personna regularly initiated conversations with Ms. Stephens, and on multiple occasions, expressed an interest in knowing the revisions Ms. Stephens made to his work. As a courtesy, Ms. Stephens discussed with him the revisions she had made to his work.

74. Around that time, Sullivan & Cromwell contract attorney Georgia Maratheftis, whom prior to her promotion to staff attorney at the firm, occupied a work seat across from Ms. Stephens' work table and confronted Ms. Stephens multiple times about the revisions that Ms. Stephens made to her work.

75. For instance, when supervisor Tifhanie Robert exited the case room, Georgia Maratheftis while staring at Ms. Stephens with contempt and disrupting Ms. Stephens as she worked stated in a raised voice: "You changing my work." Although Alain Personna and Georgia Maratheftis

16

caused Ms. Stephens to feel uncomfortable, Ms. Stephens as a courtesy also discussed the
revisions that she had made to Georgia Maratheftis' work.

76. On another day, and out of the presence of the supervisor, Georgia Maratheftis confronted Ms.
Stephens in a similar manner while stating again in a raised voice: "You changing my work."
The hostility along with Georgia Maratheftis' repeated unprofessional behavior (as explained in
more detail below) in the case room caused Ms. Stephens to feel extremely uncomfortable. At
that time, Ms. Stephens did not provide a response.

77. When Sullivan & Cromwell supervisor Tifhanie Robert returned to the case room, Ms. Stephens
asked her in the presence of Georgia Maratheftis: "Tifhanie, should we review each document
individually?" Tifhanie Robert answered in the affirmative and in the presence of Georgia
Maratheftis and other Sullivan & Cromwell attorneys in the case room told Ms. Stephens:
"You're doing a good job. Keep doing what you are doing."

**Sullivan & Cromwell Attorneys Continue to Subject Plaintiff Kalyn Stephens to an
Offensive, Hostile and Intimidating Work Environment during the Willis Group Matter
because of Plaintiff's sex, religion, sexual orientation, gender, national origin, race,
ethnicity, harassment and discrimination complaints**

78. Despite ongoing harassment, unprofessionalism, inappropriate and offensive conduct in the initial
Willis Group case room (as discussed below), Ms. Stephens and other contract attorneys were
moved to a different case room at Sullivan & Cromwell LLP's main office at 125 Broad Street
without supervisor Tifhanie Robert or any adequate and consistent supervision as needed, where
Ms. Stephens was subjected to multiple instances of harassment, discrimination, and offensive
conduct on a near-daily basis over the course of several months by Sullivan & Cromwell agents,
servants, and employees, including supervisory attorneys Anastasia Angelova, Kevin Lencki,
Georgia Maratheftis, and Tyler Smith and the attorneys whom they supervised because of Ms.

Stephens' sex, religion, sexual orientation, gender, national origin, race, ethnicity, harassment and discrimination complaints.

## Sullivan & Cromwell Attorney Alain Personna Subjects Plaintiff Kalyn Stephens to an Offensive, Hostile and Intimidating Work Environment

79. Upon moving to a different case room, Georgia Maratheftis probed Ms. Stephens again regarding her departure from her previous work place. Ms. Stephens responded by complaining about the inappropriate work conditions at Hughes Hubbard & Reed Law Firm. Ms. Stephens responded: "They were wild. They were dating each other." Ms. Stephens also told Georgia Maratheftis that they [Hughes Hubbard & Reed supervisors] kept asking her to go out with them and that she did not want to go anywhere with them.

80. Then Ms. Stephens told Georgia Maratheftis that a supervisor at Hughes Hubbard & Reed began yelling at her, indicating that the behavior caused Ms. Stephens to feel uncomfortable. Alain Personna whom was also present in the case room at that time asked Ms. Stephens where she had worked. Ms. Stephens told him that she worked for Hughes Hubbard & Reed. Alain Personna responded that he had worked there too.

81. In the case room where Ms. Stephens and other contract attorneys had been moved, Ms. Stephens continued to review the work of Alain Personna, whom regularly occupied for several months a work seat that faced Ms. Stephens' work table and seat. As Ms. Stephens reviewed his work, Alain Personna regularly initiated conversations with her and, on multiple occasions, expressed an interest in knowing the revisions that Ms. Stephens made regarding his work. During these discussions and other times, Alain Personna became hostile, started arguments with Ms. Stephens and screamed at her.

82. Around this time and during Summer 2004, Ms. Stephens visited Sullivan & Cromwell staff attorney Tifhanie Robert in the case room she had been and complained. Ms. Stephens told

Tifhanie Robert among other things: "Alain is being hostile toward me." Despite Ms. Stephens' complaint, the situation became worse, not better.

83. For instance, while working in the case room with Alain Personna, Ms. Stephens heard Alain Personna during his conversation with Sullivan & Cromwell attorney Mahesha Mitchell refer loudly to a woman as "Bitch". Ms. Stephens, who was offended and shocked, interjected by stating: "Did you really say that?" Alain Personna, who is very tall, confirmed it, and in his reply, Alain Personna repeated the word "Bitch" with no remorse while looking at Ms. Stephens with a stern face and even lunging at her in a physically threatening manner.

84. Unrestrained, Alain Personna continued to offend Ms. Stephens, humiliate her, engage in inappropriate conduct, and distract her as she worked by engaging in the following in the case room in the presence of other Sullivan & Cromwell attorneys, including supervisors by

    (a) Interrupting Ms. Stephens as she worked and telling her on multiple days: "You act old." Alain Personna had even asked Ms. Stephens her parents' age.

    (b) Berating Ms. Stephens on several days by suggesting: "You need to drink." Alain Personna had also invited Ms. Stephens to his girlfriend's 36 th birthday party. He stated among other things that his girlfriend was Jewish, repeatedly stated that she was pressuring him to marry her and complained several times that she wouldn't get a job.

    (c) Telling Ms. Stephens: "The reason white women date us is because we have big penises. It's not because we have money. We don't have any money."

    (d) Telling Ms. Stephens repeatedly: "Its all a game."

    (e) Repeatedly stating in the case room and telling Sullivan & Cromwell supervisory attorney Kevin Lencki in Ms. Stephens' presence: "A man needs to sow his wild seeds."

    (f) Interrupting Ms. Stephens as she worked and telling her on multiple days: "You're focused."

19

     (g) Probing Ms. Stephens by repeatedly stating: "You want a man at the top of his game."

     (h) Telling Ms. Stephens on multiple days: "I know how you are about your space."

85. Alain Personna, whom routinely stared intensely at Ms. Stephens' body as she worked, walked in the case room one morning where she sat alone, touched Ms. Stephens' arm without her consent, and told her: "You're getting fat."

86. Ms. Stephens also felt uncomfortable when she was forced to share a car service ride with Alain Personna although it is against Sullivan & Cromwell LLP's policy to share car service rides. Ms. Stephens felt compelled to do so, and did because she feared retaliation, which was ongoing and debilitating. Ms. Stephens felt extremely uncomfortable during the car service ride. The following morning, while Ms. Stephens was seated in the case room, Alain Personna told their supervisor and staff attorney Georgia Maratheftis that Ms. Stephens read a book during their car service ride.

87. On a different day, when Ms. Stephens arrived late for work, Alain Personna asked the reason. While Ms. Stephens was seated in the case room and when Georgia Maratheftis returned to the case room, Alain Personna repeated the incident to Georgia Maratheftis as he often did when Maratheftis was not present during Ms. Stephens' responses, thereby facilitating Georgia Maratheftis' harassment of Kalyn Stephens, Plaintiff.

88. Other mornings when Ms. Stephens arrived for work, Alain Personna or Sullivan & Cromwell attorney Mahesha Mitchell was seated in the case room. On other mornings, Alain Personna offered personal information about their supervisor and senior associate attorney Anastasia Angelova, including but not limited to telling Ms. Stephens that "Anastasia was a gymnast" and repeatedly announced: "Anastasia makes two hundred thousand dollars a year." At some point, Ms. Stephens responded: "I'm not impressed with Anastasia."

89. Sullivan & Cromwell attorney Alain Personna rarely performed any work as he sat in the case room. Instead, he regularly daydreamed, gossiped, danced, read and shared newspapers on

20

multiple days with the firm's supervisory attorney Kevin Lencki whom sat in the seat next to
Alain Personna in the case room, discussed stocks with Kevin Lencki near the Willis Group
documents which also contained financial data, discussed numerous other non-work related
topics, frequently stared at Ms. Stephens as she worked, probed her and asked her personal
questions, and taunted her for several months.

**Sullivan & Cromwell Contract Attorneys Subject Plaintiff Kalyn Stephens to an Offensive,
Hostile and Intimidating Work Environment Over the Course of Several Months During
the Willis Group Matter by engaging in the following:**

90. Probing Kalyn Stephens and routinely asking her personal questions, including but not limited to
regularly asking Plaintiff: "Ms. Kalyn, what did you do over the weekend?" Ms. Stephens, whom
routinely attended Sunday service, regularly responded, "I went to church."

91. Asking Plaintiff: "Ms. Kalyn, what did you last night?" Ms. Stephens, whom routinely watched
television during the evenings, regularly responded, "I watched tv."

92. Stating several times in Ms. Stephens' presence in the case room: "I think she [Ms. Stephens] is
asexual. Ms. Stephens believes this is in reference to her because among other things Ms.
Stephens and Georgia Maratheftis were the only female employees assigned to the Willis Group
case room at that time.

93. Expressing in Ms. Stephens' presence in the case room: "I think Ducky [Georgia Maratheftis] is a
lesbian."

94. Bragging about having a "project girlfriend" during a previous Sullivan & Cromwell LLP project,
and providing details and even a physical demonstration regarding "holding her" and "kissing
her."

95. Stating in conjunction with Sullivan & Cromwell attorney Alain Personna that white women were
attracted to their penises while emphasizing that their penis size were "big."

96. Telling Ms. Stephens whom repeatedly expressed that she did not like working as temporary employee: "All you like is money." Telling Ms. Stephens: "Even the President's job is temporary."

97. Telling Ms. Stephens that she "smell good."

98. Telling Ms. Stephens repeatedly to wear "open toe shoes" to see her toes.

99. Berating Ms. Stephens because she did not wear "open toe shoes."

100. Announcing as Sullivan & Cromwell supervisory attorney Robert walked near the case room door: "That's Tifhanie's boyfriend." Announcing repeatedly as Sullivan & Cromwell staff attorney Tifhanie Robert walked near the case room: "Tifhanie is going to see her boyfriend."

101. Discussing repeatedly the attractiveness of female employees at Sullivan & Cromwell LLP, including but not limited to the female employees whom visited the case room and routinely walked pass the case room. Although one of the contract attorneys told Ms. Stephens that she was included in the list of attractive women, Ms. Stephens felt uncomfortable because she did not welcome the unwanted attention of her.

102. Telling Ms. Stephens repeatedly: "How about you and [S&C contract attorney] David?" Telling Ms. Stephens that he would let his daughter date David and that she would. Also telling Ms. Stephens that David had a pool at his house among other things.

103. The following occurred: A contract attorney provided a personality assessment of Kevin Lencki and contract attorney Adam occurring around the time Kevin Lencki and Adam first began to work on the Willis Group matter, suggesting that Ms. Stephens consider Kevin Lencki and not Adam as a romantic interest. Ms. Stephens found this shocking, inappropriate and unwelcomed because she had not expressed a romantic interest in anyone.

104. Continuing to pique at Ms. Stephens, on another day, the contract attorney struck up a conversation with Ms. Stephens by stating: "What about you and Lil' Kev?" suggesting that Ms. Stephens engage in a romantic relationship with Sullivan & Cromwell attorney Kevin Lencki.

105.    As Ms. Stephens exited the elevator, contract attorney Adam invited her on a vacation, another thinly veiled solicitation for sex. Ms. Stephens, who felt extremely uncomfortable with the unwanted and unwelcomed attention of her, walked abruptly from the elevator to the case room to escape him.

106.    On a different day, as Ms. Stephens sat alone in the case room with contract attorney Adam, he asked her: "Why did you move to New York?"

107.    On a different day, as Ms. Stephens sat alone in the case room with contract attorney Adam, he attempted to strike up a conversation with her by telling her: "You can get a job."

108.    On another day, as Ms. Stephens sat alone in the case room with contract attorney Adam, he told her: "Guys do not like conservative women."

109.    Other contract attorney telling Ms. Stephens whom, unlike other Sullivan & Cromwell employees in the case room, speaks regularly with a Southern American accent: "Southerners sound dumb when they speak."

110.    Telling Ms. Stephens that the people in the South did not contribute to the economy.

111.    Telling Ms. Stephens repeatedly: "Listen to me."

112.    Emphasizing repeatedly in the presence of Georgia Maratheftis: "If you have any questions, do not ask [supervisory associate attorney] Anastasia [Angelova]. Anastasia does not know. Georgia knows. Ask Georgia."

113.    Telling Ms. Stephens: "I have never heard her [associate Anastasia Angelova] say a three syllabus word. The only reason she is walking around here [at S&C] is because she is a white woman."

114.    Upon information and belief, Sullivan & Cromwell LLP had only one black associate attorney, although it employs several hundreds of associate attorneys. Ms. Stephens alleges that Sullivan & Cromwell LLP did not hire her as an associate attorney because she is black.

115.    Telling Ms. Stephens: "You do not know how to hold a conversation."

23

116.    Referring to Ms. Stephens as an "angel" and a "role model." Referring to Ms. Stephens also as a "cold woman." Telling Ms. Stephens repeatedly: "Show some compassion" including but not limited to the times when Ms. Stephens opposed inappropriate, offensive, and unprofessional conduct in the case room.

117.    Telling staff attorney Georgia Maratheftis whom repeatedly harassed Ms. Stephens and whose principles and work ethic differed from Ms. Stephens, and repeating in the presence of Ms. Stephens: "She [Ms. Stephens] is not going to listen to you [Georgia Maratheftis]."

118.    Engaging in a pattern of repeating non-work related questions that Ms. Stephens ignored and/or refused to answer, including but not limited to repeating on successive workdays unwanted non-work related questions that Georgia Maratheftis asked her, for which Ms. Stephens ignored and/or desired to ignore.

119.    Telling Ms. Stephens repeatedly on subsequent dates: "Don't trust Georgia [Maratheftis]. Georgia has been talking about you behind your back."

120.    At some point, Sullivan & Cromwell supervisor Tifhanie Robert whom Ms. Stephens had complained about inappropriate conduct in the case room followed up with her regarding her complaint. She told Ms. Stephens: "You dress very well. You're doing a good job, but they're saying you won't listen to them."

121.    At another time during Summer 2004, Ms. Stephens complained to Tifhanie Robert that she wanted to be moved. Despite Ms. Stephens' complaints, Ms. Stephens was not seperated from the harassers whom she complained about.

122.    Ms. Stephens' implicit and explicit expressions of discomfort, attempts to ignore and rebuff the harassment, silence, the wearing of her personal headset repeatedly for several hours on multiple days for several months while working, vocal opposition, complaints among other things did not halt the harassment of her.

24

**Sullivan & Cromwell Supervisory Attorney Georgia Maratheftis Subjects Plaintiff to A Hostile, Offensive and Intimidating Work Environment for Several Months During the Willis Group Matter at Sullivan & Cromwell LLP's Headquarters at 125 Broad Street**

123.    During a break, Georgia Maratheftis told Ms. Stephens: "You're pretty. You have a nice figure. You dress well."

124.    As Ms. Stephens sat alone in the case room on a Saturday morning, Georgia Maratheftis arrived at work and stated: "Pretty in pink, huh" and winked her eye at Kalyn Stephens, Plaintiff.

125.    On numerous days, when Georgia Maratheftis arrived to work, she sat in her seat and stared at Ms. Stephens for prolonged periods before performing any work. This includes a time when she stared at Ms. Stephens and made a comment regarding Ms. Stephens' breathing pattern.

126.    At other times, Georgia Maratheftis routinely peeped at Ms. Stephens through the tray stack that lay on Ms. Stephens' work table, distracting Ms. Stephens as she worked and causing her to feel uncomfortable. In response, Ms. Stephens repositioned the tray stacks to obstruct Georgia Maratheftis' view of her. However, Georgia Maratheftis continued to subject Ms. Stephens to unwanted and unwelcomed attention.

127.    Georgia Maratheftis, who was present in the case room during Ms. Stephens' responses: "I went to church," referred to Ms. Stephens as a "good Christian girl." On another day, Georgia Maratheftis replied to Ms. Stephens' response in the presence of other case room employees by stating: "All there is to do where you come from is go to church."

128.    On another day, Sullivan & Cromwell attorney Alain Personna who communicated regarding the Willis Group matter only when Ms. Stephens revised his work for which he vehemently opposed, began commenting about and circulating the client's document that depicted two nude people in a sex act. Next, contract attorney Klaus Rice passed the document to Georgia Maratheftis. Georgia Maratheftis, while discussing and holding the document, stated among other things: "We better not show her this," suggesting that she knew that Ms. Stephens is a Christian conservative. (Ms. Stephens, whom recognized the illustration from a previous

25

review of the client's documents and had categorized the illustrations as nonresponsive, was the only other female employee assigned to the case room at that time).

129.     During multiple times as Ms. Stephens spoke with Klaus Rice regarding non-sex related topics, Georgia Maratheftis interrupted the conversations and directed at Ms. Stephens in a raised voice: "What about sex." Each time, Georgia Maratheftis became progressively more belligerent, causing Ms. Stephens to feel intimidated and humiliated.

130.     For instance, on another day, Georgia Maratheftis while standing up in the case room, facing Ms. Stephens and staring at Ms. Stephens in a hostile manner, raised her voice even higher: "What about sex."

131.     On another day, Georgia Maratheftis repeated the offensive and unprofessional behavior: "What about sex. Its just sex".

132.     During another time, Georgia Maratheftis chastised Ms. Stephens by telling her that she [Ms. Stephens] should not have lunch with a male without providing sex as a return.

133.     Ms. Stephens thought about requesting Klaus Rice to stop communicating with her but she did not because she feared retaliation.

134.     Georgia Maratheftis stated in the case room in the presence of other employees, "The reason the partners like to hire young associates is because they want to have sex with them." During other times, Georgia Maratheftis repeated in the case room: "The partners are slimy."

135.     During other periods in the case room, Georgia Maratheftis repeatedly advocated abortions and other viewpoints that were [and still are] contrary to Ms. Stephens' religious beliefs, which Ms. Stephens opposed by stating among other things: "It goes against my conservative beliefs" and "It goes against my values."

136.     During other times, Georgia Maratheftis repeated topics and directed questions and statements at Ms. Stephens in which Ms. Stephens responded: "We've talked about this" and "My thoughts have not changed." However, Georgia Maratheftis continued to harass Kalyn Stephens, Plaintiff.

137.     For instance, during another time Georgia Maratheftis distracted her, Ms. Stephens replied, "I have work to do." Sullivan & Cromwell supervisory attorney Georgia Maratheftis replied, "Don't work."

138.     One morning while Ms. Stephens was working, Georgia Maratheftis while arriving late for work, remained standing and began screaming at her: "You don't like gay people." Ms. Stephens replied, "You've never heard me say that I didn't like gay people." Georgia Maratheftis continued screaming wildly at Ms. Stephens until contract attorney Klaus Rice interjected by stating, "She [Ms. Stephens] did not say she did not like gay people."

139.     Despite this and on a subsequent day, Georgia Maratheftis in the same manner and in the presence of case room employees screamed at Ms. Stephens again: "Kalyn, you don't like gay people."

140.     Kalyn Stephens, Plaintiff believes this is in retaliation for rebuffing Georgia Maratheftis' advances.

141.     Ms. Stephens was offended when Georgia Maratheftis mocked her Southern accent, frequently probed her and asked her personal questions, regularly used profanity, gossiped on several days with her subordinate Mahesha Mitchell in the case room regarding the alleged romantic affairs of the Willis Group employees, and even talked about Ms. Stephens to Mahesha Mitchell as Ms. Stephens sat at an adjacent work table.

142.     For example, Georgia Maratheftis told Mahesha Mitchell on multiple days: "They don't respect me." Ms. Stephens believes and alleges that this is another retaliation against her, as Ms. Stephens believed the reference to "They" included her because among other things Ms. Stephens, who is younger than Georgia Maratheftis, did not acquiesce to Georgia Maratheftis' harassment of her. While staring at Ms. Stephens, Mahesha Mitchell responded to Georgia Maratheftis: "They're not going to respect you." Georgia Maratheftis continued speaking. Mahesha Mitchell added: "Nobody is going to respect you because of your age."

143.     As Sullivan & Cromwell supervisory attorney Georgia Maratheftis distracted Ms.
Stephens as she [Ms. Stephens] worked, Ms. Stephens responded, "Georgia, not now." Georgia
Maratheftis persisted in her harassment of Kalyn Stephens, Plaintiff. Ms. Stephens replied, "I
have work to do." Georgia Maratheftis replied, "Don't work".

144.     During other times, when Ms. Stephens gave no encouragement to Georgia Maratheftis'
offensive conduct, Georgia Maratheftis told Ms. Stephens in the case room: "You Americans are
so uptight."

145.     On another day, Georgia Maratheftis told Ms. Stephens in the case room, "The people in
Tennessee don't have teeth." Ms. Stephens believes she told her this because Ms. Stephens'
national origin is in in the Southeast region of the United States.

146.     On another day, Georgia Maratheftis told Ms. Stephens in the case room, "You need to
stop listening to your mother."

147.     On another day, Georgia Maratheftis told Ms. Stephens in the case room, "You need to
go work for the FBI," suggesting to Ms. Stephens that her [Ms. Stephens'] opportunities at the
firm were limited.

148.     On another day, in response to Ms. Stephens' opposition to Georgia Maratheftis'
harassment of her, Georgia Maratheftis told Ms. Stephens in a hostile tone: "How you gonna pay
your rent?" suggesting that she had authority over Ms. Stephens and could use it to her detriment.
Ms. Stephens responded: "I'm not sure." Alain Personna added, "Ducky, you are golden."
"Ducky" is the nickname Alain Personna, Klaus Rice, and Mahesha Mitchell had given Georgia
Maratheftis after she bragged in the case room about beating her brother with a hammer. This too
troubled Kalyn Stephens, Plaintiff.

149.     Alain Personna and contract attorney Klaus Rice together and alone repeatedly told Ms.
Stephens: "Georgia has been talking about you behind your back. Don't trust her."

150.     Ms. Stephens believes this to be true because Georgia Maratheftis criticized supervisory
attorney Tifhanie Robert out of her presence, including but not limited to a) complaining that the

supervisor [Tifhanie Robert] warned her about being late for work and Georgia Maratheftis whom continued to arrive late for work even admitted that she needed to arrive on time, b) telling Ms. Stephens that Tifhanie Robert did not want the contract employees talking to each other in the case room, c) telling Ms. Stephens that Tifhanie Robert had questioned a time that Ms. Stephens had returned from her lunch break, telling Ms. Stephens that Tifhanie Robert complained about her [Georgia Maratheftis] eating in the case room and stated that she did not complain about Klaus Rice eating in the case room among other things.  In addition, Ms. Stephens felt troubled and distracted when Georgia Maratheftis told her: "She [Tifhanie Robert] just started her job," emphasizing the supervisor's vulnerability.

151.      In addition, Georgia Maratheftis often made disparaging remarks about Klaus Rice out of his presence, and Mahesha Mitchell by stating among other things: 'She [Mahesha Mitchell] is the type of person to file unemployment benefits while she is working.'  Georgia Maratheftis and her subordinates repeatedly stated in the case room that Mahesha Mitchell was "faking" an injury from a car accident and attempted to engage Ms. Stephens in the conversations and stated that Mahesha Mitchell had abandoned the Willis Group project to work on another matter citing that Mahesha Mitchell was not satisfied with the terms and conditions of the Willis Group project (neither was Ms. Stephens).  Ms. Stephens believes the statements were an effort to form a close relationship with her, which Ms. Stephens had no interest.

152.      When Ms. Stephens spoke to contract attorney Klaus Rice regarding former Secretary of State Condoleezza Rice, Georgia Maratheftis on several days interrupted by stating: "I don't like her."  Finally, Ms. Stephens asked Georgia Maratheftis: "Why do you feel that way?"  Georgia Maratheftis replied: "I just don't like her."

153.      When the case room employees recommended that Ms. Stephens move to Manhattan, Georgia Maratheftis did not comment in the presence of other black employees.  However, out of the presence of other employees, Georgia Maratheftis, who is white brought up the subject again by telling Ms. Stephens: "A landlord in Manhattan will not rent to you because you are black."

29

Subsequently, when the case room employees recommended again that Ms. Stephens move to Manhattan, Georgia Maratheftis remained silent in the presence of black employees in the case room.

154.      On a different day, and out of the presence of Alain Personna and other case room employees, Georgia Maratheftis stated while smiling and staring at Ms. Stephens: "Alain said Wendy Williams' husband is a drug dealer." Wendy Williams, who is African American and whose husband is also black, is a former radio personality whose biography Ms. Stephens read during the car service ride that she was compelled to share with Alain Personna, and whom when supervisor Kevin Lencki asked Ms. Stephens in the case room whom she listened to on the radio, Ms. Stephens responded: "I listen to the Wendy Williams show."

155.      Kalyn Stephens, Plaintiff, while listening to her headset which she often did as she worked, began to hear Georgia Maratheftis' headset. Ms. Stephens believes that Georgia Maratheftis intentionally increased the volume on her headset to distract and annoy Ms. Stephens because Georgia Maratheftis among other things began to listen to a headset several days after Ms. Stephens had regularly listened to her headset. Because the loud volume of Georgia Maratheftis' headset had distracted Ms. Stephens, Ms. Stephens increased the volume on her personal headset. Both volumes were distracting. At some point, Ms. Stephens asked Georgia Maratheftis to readjust her headset volume and with reservation, Georgia Maratheftis finally stopped listening to her headset.

156.      Ms. Stephens believes Georgia Maratheftis' offensive statements and conduct were made with the intent to cause her emotional distress, which they did, because among other things in the case room where they had been, Georgia Maratheftis made a derogatory remark regarding contract attorney Annette's Italian ethnicity, causing Annette to become very upset. Ms. Stephens was distracted as she heard the offensive epithet while working and she was also offended and felt extremely uncomfortable because Ms. Stephens is a member of an ethnic

minority. Shortly thereafter, contract attorney Annette stopped working on the Willis Group matter. Upon information and belief, Annette did not return to work for the firm.

157.    On multiple days as Ms. Stephens worked, Georgia Maratheftis and her subordinates repeatedly referred to associate Anastasia Angelova as "Honorable" and "HRH" when discussing her. Georgia Maratheftis and her subordinates distracted Ms. Stephens even more, when they began pressuring Ms. Stephens to refer to Anastasia Angelova by using "Honorable" and "HRH". Ms. Stephens whom had been working paused and responded, "I'm not calling her that." Georgia Maratheftis and her subordinates continued pressuring Kalyn Stephens, Plaintiff. Ms. Stephens replied, "I'm not sure if she's honorable." Ms. Stephens added: "I am referring to Anastasia as Anastasia because Anastasia introduced herself as Anastasia."

158.    On multiple days, Georgia Maratheftis confronted Ms. Stephens in the presence of other case room employees by stating: "You don't like Anastasia." Several times, and in the presence of other case room employees, Ms. Stephens responded, "I don't like the way Anastasia treats me. She treats me differently than she treats other people." Ms. Stephens also stated: "She [Anastasia Angelova] is uncivilized." Several times, Ms. Stephens provided examples of Anastasia Angelova's discriminatory treatment of her, which Georgia Maratheftis witnessed and became worse. One day as Ms. Stephens smiled, Georgia Maratheftis stated: "The associate [Anastasia Angelova] won't think you are working if you smile." Ms. Stephens also found this criticism unwarranted because she worked diligently, unlike many of the case room employees, including Georgia Maratheftis and the case room employees whom she supervised.

159.    During the fire drill, Georgia Maratheftis criticized Ms. Stephens for not joining her and other case room employees when they reached the plaza, including but not limited to stating: "She don't wanna come with us." Ms. Stephens had walked in an opposite direction when she reached the plaza. Georgia Maratheftis' attention of her continued to be unwanted and unwelcomed.

160.     Georgia Maratheftis, whom consistently arrived late for work and became very upset
when staff attorney Tifhanie Robert warned her, began complaining to contract attorney Adam
the following: 'When Tifhanie was the supervisor she did not want us talking to each other and
she threatened to fire me for being late for work. Right, Kalyn?' Ms. Stephens, whom observed
Georgia Maratheftis routinely arrive late for work before and after the warning replied, "Georgia,
you were late." Georgia Maratheftis replied in a raised voice, "Tifhanie is no longer on the
project but I am", suggesting once again that she [Georgia Maratheftis] had authority over Ms.
Stephens and could use it to Ms. Stephens' detriment.

161.     During another time, Georgia Maratheftis exclaimed: "It's not the smart people or the
people who come to work on time who walk around here [at Sullivan & Cromwell LLP]."

162.     On another occasion, Georgia Maratheftis walked in the case room and before sitting
down, and in the presence of other employees Georgia Maratheftis yelled at Ms. Stephens:
"Kalyn, did you say that I was dumb." Kalyn Stephens replied, "Georgia, I never stated that you
were dumb."

163.     Somewhat ironically, Georgia Maratheftis labeled people dumb, which Ms. Stephens
opposed. For instance, Georgia Maratheftis repeatedly stated: "Bush is dumb." Ms. Stephens
disagreed by stating: "I don't think President Bush is dumb" and "President Bush isn't dumb."
Ms. Stephens also provided examples, including but not limited to former President Bush's
performance during the presidential debate.

164.     In another to attempt to rebuff Georgia Maratheftis' inappropriate and offensive
comments, Ms. Stephens stated in the presence of Georgia Maratheftis in the case room: "I
support the Republican party because it's pro-religion." Despite this, Georgia Maratheftis
repeatedly stated: "The Republicans are dumb."

165.     Ms. Stephens ignored her until Georgia Maratheftis while standing in the case room and
staring at Ms. Stephens repeated: "Republicans are dumb." Ms. Stephens, who was offended at
Georgia Maratheftis' harassment of her and her inappropriate and unprofessional conduct, finally

32

responded: "Why would you say that while I'm sitting here?" Ms. Stephens requested that Georgia Maratheftis stop signing for her car service rides because she wanted to avoid interacting with her.

166.     The car service ride sign-up process required that contract attorneys list their names, departure times, and home addresses. There was a separate signup sheet for each borough and surrounding areas. Each sign up sheet contained multiple columns to list several names, departure times, and home addresses. All signup sheets visibly displayed this information. Ms. Stephens would have needed to communicate with Georgia Maratheftis regarding changes, including changes to her home address and departure times. In the case room they had been, Georgia Maratheftis who was a contract attorney at that time collected the home addresses of the contract attorneys. The information was visibly displayed on a note pad in both case rooms. This caused Ms. Stephens to feel very uncomfortable.

### Sullivan & Cromwell Supervisory Attorney Georgia Maratheftis Subjects Ms. Stephens to Physical Aggression

167.     As Ms. Stephens returned from signing for her car service ride, Georgia Maratheftis obstructed Ms. Stephens' path by walking aggressively towards her, running into her and making physical contact with her although Ms. Stephens had attempted to walk around her.

168.     On another day, as Ms. Stephens returned from signing for her car service ride, and as Ms. Stephens walked near the case room, Georgia Maratheftis once again obstructed Ms. Stephens' path by walking aggressively towards her and running into Ms. Stephens again by making physical contact with her as Ms. Stephens attempted to move out of the way.

169.     In the Willis Group case room, as Ms. Stephens added an orange cover sheet to her review of Alain Personna's work and began writing on the cover sheet as required when designating a critical document "Hot", Georgia Maratheftis criticized Ms. Stephens by stating: "You don't have to write all of that." Ms. Stephens continued writing, as several samples of

"Hot" document sheets containing Ms. Stephens' writings, including Ms. Stephens' revisions to
Georgia Maratheftis' and Alain Personna's work had been circulated in the case room, which Ms.
Stephens witnessed Georgia Maratheftis review before Georgia Maratheftis passed copies to her.

170.     Georgia Maratheftis, while staring at Ms. Stephens, also interrupted her to criticize when
Ms. Stephens replaced a green cover sheet used when designating a document "Responsive."
Georgia Maratheftis, while glancing several times at Alain Personna and looking at Ms. Stephens
with contempt, began confronting Ms. Stephens about replacing the sheets that contained Alain
Personna's writings. Georgia Maratheftis became even more confrontational by stating: "You
don't have to change the sheets." Ms. Stephens continued, as she had followed this process
several times when making corrections to Alain Personna's and Georgia Maratheftis' work and
no one had complained.

171.     On multiple occasions, as Kalyn Stephens reviewed client documents, Georgia
Maratheftis while staring at Kalyn Stephens, stated in a raised voice: "You don't have to read all
of that."

172.     Georgia Maratheftis resorted to attacking Kalyn Stephens' work comments even when
there was not a basis, including but not limited to repeating Kalyn Stephens' comments in a
confrontational way. Contract attorney Adam often interjected to say: "That is what Kalyn said"
and "That is what Kalyn meant" and "Kalyn is right", suggesting that Georgia Maratheftis'
criticism of Kalyn Stephens' work comments were unwarranted.

173.     When Kalyn Stephens ignored Georgia Maratheftis' unwarranted criticism of her work,
Georgia Maratheftis resorted to criticizing Ms. Stephens' work to other employees in the case
room as Ms. Stephens worked, including but not limited to stating: "She [Ms. Stephens] made all
those documents responsive." Mahesha Mitchell, who was the only other female employee
whom worked in the Willis Group case room, finally replied, "Tell her, don't tell me." Georgia
Maratheftis responded, "She [Ms. Stephens] is going to do all the work."

34

**Sullivan & Cromwell Supervisory Attorney Kevin Lencki Subjects Kalyn Stephens to A Hostile, Offensive and Intimidating Work Environment During the Willis Group Matter**

174.     In or around the Fall of 2004, Sullivan & Cromwell staff attorney Kevin Lencki and contract attorney Adam began working in the Willis Group case room.  Sullivan & Cromwell supervisory attorney Georgia Maratheftis provided directions regarding the Willis Group matter.

175.     In the mornings when Ms. Stephens arrived to work, Kevin Lencki and Adam often sat alone or together in the case room.  Kevin Lencki and/or Adam greeted Ms. Stephens in the mornings when she arrived to work.  Uncomfortably, Ms. Stephens greeted them back.

176.     Several times, Kevin Lencki probed Ms. Stephens and asked her personal questions when she arrived to work before she had an opportunity to remove her coat.  For instance, Kevin Lencki asked Ms. Stephens where she lived.  Uncomfortably, Ms. Stephens provided succinct responses because she was not interested in revealing private information regarding her and did not want to make her professional life even more uncomfortable.

177.     On other days when Ms. Stephens arrived to work, Kevin Lencki struck up conversations with her regarding politics.  She believes that he was trying to establish a connection with her because she had engaged in conversations in the case room regarding the topic, and she believes he did so when she arrived to work in the mornings because during other times, she regularly listened to the radio or CD disks while working.

178.     Ms. Stephens felt less vulnerable while wearing her headset and often listened to the radio or CD disks while working, as it was soothing, a barrier and a mechanism to ignore the other employees' distractions, and unwanted and unwelcomed attention of her.

179.     On one day, Kevin Lencki told Ms. Stephens: "You're pretty," indicating that she prevailed in a hearing because of her appearance.  Ms. Stephens did not respond because she did not welcome his unwanted attention of her and did not want to encourage it.

180.     Despite Ms. Stephens' effort to rebuff and ignore his unwanted attention of her, Kevin Lencki advances continued.  The following ensued:

35

(a) On one occasion, a contract attorney whom had routinely initiated unwanted and unwelcomed non-work related conversations regarding Ms. Stephens, berated Ms. Stephens in the presence of other case room employees by stating: "You do not know how to hold a conversation", suggesting that he was annoyed with Ms. Stephens' limited responses.

(b) When Ms. Stephens returned from her lunch break, Kevin Lencki whom was alone in the case room with her and who was not in the case room during other times Ms. Stephens had returned from lunch, approached her while she sat at her work table, and kneeled very close to her. Ms. Stephens believes that this was an orchestrated act and an opportunity to get her to spend time with him away from work, and to develop a close, personal relationship with her.

(c) Specifically, Kevin Lencki began gossiping about the contract attorney and repeating derogatory information that the contract attorney had already revealed about himself in the case room, and still while kneeling very close to Ms. Stephens began asking about her CD disks. Uncomfortably, Ms. Stephens let Kevin Lencki peruse her CD disks.

(d) During this time, Kevin Lencki, who is white, also told Ms. Stephens that a famous rap artist (who is black) was dealing drugs and his psychic indicated it would lead to trouble, causing Ms. Stephens to feel more uncomfortable when he offered to take her to a place to buy CD disks. Ms. Stephens replied, "No, thank you." Then Kevin Lencki stated that he was leaving.

(e) Ms. Stephens offered him her umbrella because it rained during her lunch break, and she did not want him to retaliate against her and make her professional life even more uncomfortable. Kevin Lencki declined and told her that she was sweet, and walked out of the case room.

181.     On one occasion, as Ms. Stephens was returning from her lunch break, Kevin Lencki whom was walking with his subordinate Mahesha Mitchell near the outside stairs of Sullivan &

Cromwell LLP's office at 125 Broad Street, paused as Ms. Stephens walked passed and stated, "See I told you." Mahesha Mitchell whom he had been speaking to laughed.

182.     Kevin Lencki often made noises as Ms. Stephens spoke in the case room, took credit for her answers, and had accused her of using a double negative. Ms. Stephens believes that Kevin Lencki harassed her and subjected her to criticism because she spurned his unwanted attention of her. He did not subject the firm's other female employees, Georgia Maratheftis and Mahesha Mitchell to this type of treatment, who, unlike Ms. Stephens, spent time with him outside of the case room.

183.     On several days, in the case room, Kevin Lencki made inappropriate and offensive remarks regarding his wife and/or the mother of his children by telling Ms. Stephens among other things that his wife looked "old", and stated that she once looked like "a porcelain doll". Ms. Stephens was appalled and offended that Kevin Lencki insulted his wife or the mother of his children, and she felt very uncomfortable. Ms. Stephens attempted to rebuff him by stating: "I'm pretty sure she still has some beauty." Kevin Lencki insisted otherwise and attempted to justify his actions including but not limited to describing his altercations with his wife, stating that his wife had sex with another man during their marriage, and even made disparaging ethnic remarks regarding his wife's family and background, which he stated is Italian. Kevin Lencki also boasted that he cheated on his wife. The offensive comments were ongoing and unwelcomed.

184.     Kevin Lencki, whom had identified himself as Catholic, mispronounced Ms. Stephens' first name on several days, and even referred to Ms. Stephens by using her middle name. Ms. Stephens had never told Kevin Lencki her middle name. This caused Ms. Stephens to feel as if she was being watched.

185.     When Ms. Stephens was alone in the case room after her dinner break, Kevin Lencki, whom had previously indicated that he was 40-something and while walking towards Ms. Stephens whom is significantly younger than he and was seated at her work table berated her by stating, "You young attorneys like to scream." Sullivan & Cromwell supervisory attorney

37

Georgia Maratheftis, whom had returned with Kevin Lencki, repeated while smiling at Ms. Stephens, "Yeah, you young attorneys like to scream."

186.    On another day, as Ms. Stephens sat alone in the case room with Kevin Lencki and Georgia Maratheftis after the pair returned together from dinner break, Kevin Lencki bragged that he partied when he was in college. Georgia Maratheftis replied that she partied when she was in college too. Ms. Stephens believes that the pair formed an alliance and took breaks together because during her dinner break, she saw the pair together.

187.    For instance, although Ms. Stephens usually took a dinner break before the pair, she observed on one occasion as she entered the cafeteria, Georgia Maratheftis, Kevin Lencki, and contract attorney Adam sitting together, and Kevin Lencki and Adam looking and smiling at her. Ms. Stephens sat at a different table because she did not welcome the unwanted attention of her.

188.    On another day, as Ms. Stephens sat alone in the case room with Kevin Lencki and Georgia Maratheftis after they returned together from dinner break, Kevin Lencki and Georgia Maratheftis bragged that they did not make good grades when they were in college.

189.    During other times, as Ms. Stephens sat alone in the case room with Kevin Lencki and Georgia Maratheftis after her dinner break, Maratheftis on several occasions resorted to calling Ms. Stephens names including and not limited to "Narcissist", which she also used to describe Ms. Stephens during other times.

190.    Georgia Maratheftis also told Ms. Stephens in the presence of Kevin Lencki: "You think you are pretty."

191.    On another day, Georgia Maratheftis shouted at Ms. Stephens in the presence of Kevin Lencki: "Skinny legs."

192.    Ms. Stephens believes Georgia Maratheftis and Kevin Lencki engaged in inappropriate and distracting behavior because Ms. Stephens did not acquiesce to their unwanted attention of her.

193.　　　　Ms. Stephens also felt uncomfortable and distracted, and also found it strange when Georgia Maratheftis on several occasions exited her seat at an adjacent work table, walked pass Ms. Stephens' seat, and visited Kevin Lencki at his work table, as the case room was small.

194.　　　　Kevin Lencki, who was present on multiple occasions when Georgia Maratheftis and Mahesha Mitchell separately harassed and falsely accused Ms. Stephens of not liking gay people, and present when Ms. Stephens stated that she liked all people but indicated that she thought the gay lifestyle was wrong, initiated a conversation with Ms. Stephens regarding the subject by asking her as he made distinctive facial gestures if she thought people were born gay and expressing among other things that people are born gay.  Although Kevin Lencki was looking at the wall and not in Ms. Stephens' direction, Ms. Stephens presumed that he was talking to her because they were the only people in the case room at that time.

195.　　　　In another attempt to annoy her and on a different day, Kevin Lencki told her that some Republicans are gay.  Ms. Stephens replied: "I know about the Log Cabin Republicans."

196.　　　　On another occasion as Ms. Stephens sat alone in the case room with Kevin Lencki, he asked her: "How do you feel about affirmative action?"  Ms. Stephens replied, "I support it."  Kevin Lencki stated, "White men are discriminated against."  Ms. Stephens replied, "Really?"  She added, "Are white men really discriminated against?"  Kevin Lencki repeated, "White men are discriminated against."  Although Ms. Stephens is not a white male, she believes she was discriminated against throughout her employment at Sullivan & Cromwell LLP because she is a native American black woman, unlike many of the attorneys at the firm.

## Sullivan & Cromwell Supervisory Attorney Tyler Smith Subjects Ms. Stephens to A Hostile, Offensive and Intimidating Work Environment During the Willis Group Matter

197.　　　　Sometime around the Fall of 2004, Tyler Smith, a first year associate, began visiting the case room with senior associate Anastasia Angelova.  On several days, Tyler Smith visited the

case room without Anastasia Angelova, occupied the vacant seat next to Ms. Stephens, and made Ms. Stephens feel uncomfortable when he stared intensely at Ms. Stephens' buttock.

198.    On another day, Ms. Stephens observed Tyler Smith whom had walked pass her seat while holding a document in his hand, approach staff attorney Kevin Lencki, suggesting that he wanted to consult with him about work. However, Tyler Smith did not consult with Kevin Lencki, as Kevin Lencki made a hand gesture for him to go away, and Tyler Smith walked away.

199.    On a subsequent day, Tyler Smith stood in the doorway and asked: "Who is Kalyn?" Ms. Stephens replied, "I'm Kalyn." Then Tyler Smith occupied the chair that was usually vacant next to Ms. Stephens' workable, reviewed work, and repeatedly interrupted Ms. Stephens as she reviewed a box of documents. More specifically, Tyler Smith repeatedly showed Ms. Stephens a document and each time say only: "This is not a responsive document." Although Ms. Stephens was also reviewing documents, she paused to read the documents that Tyler Smith handed her and each time she finished, Ms. Stephens said: "Thank you."

200.    Contract attorney Klaus Rice, who along with other case room employees, witnessed Tyler Smith's harassment of Ms. Stephens, complained in the presence of other employees in the case room: "He [Tyler Smith] just started." Upon information and belief, Tyler Smith, who was one of Ms. Stephens' numerous supervisors (whom were all white), began working as a full-time associate in Fall 2004.

201.    During a later time and when most employees were away from the case room, staff attorney Kevin Lencki told Ms. Stephens that he had become friends with Tyler Smith and indicated that he had communicated with him regarding non-work related matters, including his girlfriend. Ms. Stephens believes Kevin Lencki told her this to suggest that he could intervene in Tyler Smith's mistreatment of her. Ms. Stephens also believes that Kevin Lencki played a role in this because she did not acquiesce to his harassment of her.

202.    During Winter 2004, as Ms. Stephens was taking the train to work, Tyler Smith and a Sullivan & Cromwell female litigation assistant rode in the same train car with Ms. Stephens and

40

stood very close to her. While holding the same train rail as Ms. Stephens, Tyler Smith stared intensely at her eyes for a long time although he was engaged in a conversation with another Sullivan & Cromwell employee. Then Tyler Smith began talking incessantly about his girlfriend and his work at the firm. This occurred for several train stops. Ms. Stephens feels as if she was being watched.

203.    On a subsequent day, Tyler Smith visited the case room again and sat in the seat next to Ms. Stephens' worktable. He briskly turned document pages, suggesting that he was annoyed. Ms. Stephens believes Tyler Smith did this to cause her emotional distress, and he did.

204.    For example, while briskly turning document pages causing Ms. Stephens to feel uncomfortable again and distracting her, Tyler Smith repeatedly interrupted Ms. Stephens from her work and showed her numerous documents and stated each time: "This is not a responsive document" and did not offer any explanations. Each time, Ms. Stephens paused from her work to review the documents that Tyler Smith had showed her and replied, "Thank you." At some point after Tyler Smith showed Ms. Stephens a series of similar documents, Ms. Stephens asked: "Do you want me to make changes?" Tyler Smith responded forcefully and loudly, "No." Tyler Smith did not approach and critique other employees in the case room, and did not subject other case room employees to this type of mistreatment.

205.    On another day, when Tyler Smith returned to the case room, Klaus Rice and other employees in the case room told him to go away among other things. Tyler Smith walked away and did not return to the case room. When he exited the case room, Georgia Maratheftis stated, "He is gay."

206.    Alain Personna who did not express opposition stated, "Kalyn, you didn't say anything." Alain Personna reiterated: "You never have anything bad to say about anybody."

**Sullivan & Cromwell Attorney Mahesha Mitchell Subjects Plaintiff Kalyn Stephens to A Hostile, Offensive and Intimidating Work Environment During the Willis Group Matter**

41

207.     At some point during Summer 2004, Sullivan & Cromwell attorney Mahesha Mitchell was added to the Willis Group project. Mahesha Mitchell, whom Ms. Stephens had never met or worked with, arrived on her first day of work in the Willis Group case room, and before introducing herself and while still standing in the case room, began yelling at Ms. Stephens among other things: "I've been doing this for a long time. I know." This occurred as Alain Personna vehemently expressed opposition to the changes Ms. Stephens made while reviewing his work. Mahesha Mitchell, who was standing near an adjacent work table, did not review the document, as it lay on Ms. Stephens' work table.

208.     In the beginning, and on several days in the case room, Mahesha Mitchell winked her eye several times at Ms. Stephens, causing Ms. Stephens to feel uncomfortable again.

209.     Mahesha Mitchell was present in the case room during Ms. Stephens' responses: "I went to church." On at least one occasion, Mahesha Mitchell immediately replied: "There is no God." The case room was quiet when on at least another occasion in the case room, Mahesha Mitchell yelled: "There is no God."

210.     On several days in the presence of other case room employees, Mahesha Mitchell made disparaging remarks regarding Ms. Stephens' religious practices by repeatedly stating among other things: "Women who go to church are freaks", suggesting that women who attend church are promiscuous.

211.     Shortly after Sullivan & Cromwell attorney Alain Personna harassed Ms. Stephens regarding establishing a romantic relationship with contract attorney David and she had rebuffed him [Alain Personna] because she had no interest, Mahesha Mitchell who was also sitting in the case room at that time immediately began harassing Ms. Stephens regarding establishing a nonprofessional relationship with David, causing Ms. Stephens to feel even more uncomfortable. Ms. Stephens reiterated, "I like David as a person," suggesting that she was not interested in a romantic relationship with David.

212.     Ms. Stephens, whom often wore her headset in the case room, was wearing her headset when Alain Personna called her name multiple times. Although Ms. Stephens ignored him, Mahesha Mitchell began calling Ms. Stephens' name several times, subjecting Ms. Stephens to more distraction and stress.

213.     On another morning, Mahesha Mitchell arrived late for work and although the case room was quiet, Mahesha Mitchell, while standing in the presence of Sullivan & Cromwell supervisory attorney Kevin Lencki, began yelling at Ms. Stephens and accused her of not liking gay people and shouted: "That's wrong, that's bigotry." This occurred after Mahesha Mitchell had witnessed supervisor Georgia Maratheftis' similar harassment of Ms. Stephens and Mahesha Mitchell had even replied and stated several times in the case room: "Can we all get along." Ms. Stephens believes that she mocked Rodney King's famous plea because Rodney King is African American like Kalyn Stephens, Plaintiff.

214.     Somewhat ironically, during Ms. Stephens' lunch break, Mahesha Mitchell interrupted Ms. Stephens and while pointing at Alain Personna and out of the presence of other employees stated: "We think gay is wrong too." Alain Personna identified himself as Haitian (Caribbean) and Mahesha Mitchell identified herself as Jamaican (Caribbean).

215.     Multiple times, Mahesha Mitchell began speaking: "My grandmother was West Indies (Caribbean). That's where I get my hair." On another occasion, Mahesha Mitchell repeated the statement and added: 'Umm' as she often did when Ms. Stephens did not respond to her comments or questions. Finally, Ms. Stephens understood the meaning of Mahesha Mitchell's comments when another Sullivan & Cromwell employee asked Ms. Stephens: "Are you Caribbean?" Ms. Stephens responded, "No, I'm African American." The Sullivan & Cromwell employee replied, "You have a head full of hair to be African American." Ms. Stephens found the comments offensive.

43

216.     On another day, and during Ms. Stephens' lunch break and as Ms. Stephens chewed her
         food, Mahesha Mitchell began asking Ms. Stephens questions regarding Atlanta. Ms. Stephens
         replied, "You should visit, you might like it."

217.     Despite this and on a different day, and during Ms. Stephens' lunch break and in the
         presence of Alain Personna, Mahesha Mitchell expressed: "When people in New York visit
         Atlanta, they say the people don't talk to them. Why won't they talk to us?' During another
         time, Mahesha Mitchell had alluded to this. Ms. Stephens replied, "I don't know." Ms. Stephens
         believes Mahesha Mitchell made the comments to encourage Ms. Stephens to communicate with
         her harassers, including her.

218.     During another lunch break, Mahesha Mitchell, in the presence of Alain Personna,
         engaged Ms. Stephens in a conversation regarding drug use. Ms. Stephens argued the negative
         consequences of drug use, including unwanted addiction. Ms. Stephens also stated: "I don't
         know if I would be immune." Mahesha Mitchell insisted: 'Marijuana is not a gateway drug',
         indicated that its use was not dangerous, and suggested that Ms. Stephens experiment with
         marijuana. Ms. Stephens whom was appalled and insulted replied, "I hope you are not
         insinuating that I smoke marijuana."

219.     During other times as Ms. Stephens expressed her viewpoints in the case room, and in the
         presence of Sullivan & Cromwell supervisory attorney Kevin Lencki and supervisory attorney
         Georgia Maratheftis, Mahesha Mitchell often made aggressive and threatening hand gestures to
         interrupt Ms. Stephens as she spoke, once again causing Ms. Stephens to feel offended and
         intimidated. No one intervened.

220.     As supervisor Kevin Lencki talked about his wife in the case room and engaged Mahesha
         Mitchell, Ms. Stephens became even more distracted and shocked when she heard Kevin Lencki
         talk about his wife physically striking him. Ms. Stephens whom had recalled his earlier
         conversations interjected by stating: "Your wife weighs 110 pounds and she tried to fight you?"

44

Kevin Lencki provided more details. Mahesha Mitchell replied, "You need a sista," suggesting that Kevin Lencki engage in a close relationship with a combative black woman.

221.     Mahesha Mitchell, whom often talked about her work offers, expressed that she was not happy with the reduced work hours during the Willis Group project, pressured Ms. Stephens to stop working on the Willis Group project by repeatedly recommending among other things that Ms. Stephens abandon her work on the Willis Group project even before and after the reduction in work hours, and indicated that she could refer Ms. Stephens to an employment agency.

222.     On one occasion, as Ms. Stephens had arrived to work and as she walked to her seat, Mahesha Mitchell began commenting on the work terms. Ms. Stephens as she walked to her work seat replied, "I will be happy when it ends" because the conditions and treatment of Ms. Stephens at Sullivan & Cromwell LLP were demeaning. Mahesha Mitchell responded: "I know."

223.     In addition, Mahesha Mitchell repeatedly asked Ms. Stephens questions regarding her personal finances and work plans when Ms. Stephens arrived to work in the mornings and during other times. Ms. Stephens repeatedly replied: "I'm not sure." In a final response, Ms. Stephens stated: "I'll let them [her employers] end it." Klaus Rice, whom was present, stated among other things that he was also committed to work on the Willis Group case.

224.     On one occasion, Mahesha Mitchell did not circulate a document that should have been reviewed by employees in the case room. Because Ms. Stephens did not read the document, she walked to Mahesha Mitchell's work table to review it. Mahesha Mitchell, whom communicated regularly regarding her private law practice and took her client calls during work hours at Sullivan & Cromwell LLP, did not release the document, folding it as Ms. Stephens attempted to read it. Although Ms. Stephens asked while standing near Mahesha Mitchell: "Can I see the document?", Mahesha Mitchell continued to cover the document with her hand, allowing Ms. Stephens to read only a part of the document. Frustrated, Ms. Stephens returned to her seat.

225.     In addition, Mahesha Mitchell dropped a box on Ms. Stephens' body in the presence of other Sullivan & Cromwell employees. Sullivan & Cromwell supervisor Kevin Lencki and

45

supervisor Georgia Maratheftis witnessed this. Ms. Stephens believes Mahesha Mitchell did this
to cause her emotional distress, and she did.

226.     Mahesha Mitchell, whom rarely worked on the Willis Group matter as she sat in the case
room, constantly stared at Ms. Stephens for prolonged periods and criticized Ms. Stephens as Ms.
Stephens worked, and repeatedly yelled at her. Ms. Stephens is the only person in the case room
whom Mahesha Mitchell treated in a hostile manner. Ms. Stephens believes Mahesha Mitchell
openly subjected her to offensive conduct because she [Ms. Stephens] is an African American
woman, unlike other case room employees. When staff attorney Georgia Maratheftis bragged
about shouting at Sullivan & Cromwell legal assistant Jamie Bunyan, whom is white, Mahesha
Mitchell replied while staring at Ms. Stephens: "I know not to do that. I would be out the door."

227.     In addition, during Ms. Stephens' breaks and when Mahesha Mitchell was sitting in the
case room alone several times as Ms. Stephens arrived for work in the morning, Mahesha
Mitchell alluded to and asked Ms. Stephens race-sensitive questions about life and work
experiences in Atlanta and Boston, even occurring upon Ms. Stephens entering the case room in
the mornings and walking towards her seat.

228.     For example, on one morning as Ms. Stephens walked towards her seat, Mahesha
Mitchell also stated: "They're racist. Aren't they?" suggesting that Sullivan & Cromwell LLP
engaged in race bias.

229.     On another morning, during Mahesha Mitchell's conversation with Sullivan & Cromwell
supervisor Kevin Lencki, Mahesha Mitchell stated that during a court appearance for a client
whom she represented that she believed that a judge ruled against her [Mahesha Mitchell]
because she is black.

230.     Mahesha Mitchell, whom occupied the seat next to Georgia Maratheftis and Klaus Rice,
and stared at Kalyn Stephens for long periods on several days throughout the Willis Group
project as Kalyn Stephens reviewed documents, often shouted aggressively across the room at

Kalyn Stephens: "That's not a responsive document." Kalyn Stephens erred on the side of responsiveness when categorizing documents as per instructions but did not express this or reply.

231.     During other times, as Mahesha Mitchell alone and together with Sullivan & Cromwell supervisor Georgia Maratheftis attacked Kalyn Stephens' work-related comments regarding the Willis Group case, contract attorney Adam interrupted to say: "Kalyn is right."

**Sullivan & Cromwell Senior Associate and Supervisory Attorney Anastasia Angelova Subjects Plaintiff Kalyn Stephens to A Hostile, Offensive, and Intimidating Work Environment**

232.     In the Summer of 2004, staff attorney Tifhanie Robert informed Ms. Stephens that their ultimate supervisor Anastasia Angelova stated that "she didn't have time for it [Ms. Stephens' harassment complaint]." Shortly afterwards, Anastasia Angelova retaliated against Ms. Stephens for complaining about sexual harassment and singled her out for further harassment and discrimination due to her sex (woman), religion (Christian), sexual orientation (heterosexual), gender (female), national origin (American), race (black), and ethnicity (African American) by engaging in the following:

**Supervisory Attorney Anastasia Angelova Ridicules Plaintiff Kalyn Stephens**

233.     Anastasia Angelova singled out Ms. Stephens for scrutiny and critique while she did not critique the performance of employees who did not complain about discrimination in the workplace.

234.     For instance, Anastasia Angelova walked aggressively and angrily towards Ms. Stephens as she sat in her seat in the case room and disrupted Ms. Stephens from her work by shoving documents towards her while pointing at the document without uttering a word. Each time, Ms. Stephens paused from her work to review the document as Anastasia Angelova held it in her hand. Anastasia Angelova then hastily snatched the document away and scurried out of the case room. This occurred several times.

235.     Ms. Stephens complained: "Why does she behave that way?"  Georgia Maratheftis who
witnessed the harassment responded, "People here are not nice like the people where you come
from."  However, Anastasia Angelova did not subject other case room employees to this type of
treatment.

236.     During multiple episodes and as Anastasia Angelova stood very close to Ms. Stephens,
Ms. Stephens observed the open-toe flip flops that Anastasia Angelova wore and her unkempt
hair.  In addition, Ms. Stephens complained that Anastasia Angelova repeatedly wore the same
suit two and even three times in one workweek (Monday - Friday).  Specifically, Ms. Stephens
complained: "She wears the same suit twice in one week."  Anastasia Angelova's hygiene
troubled Ms. Stephens because Anastasia Angelova routinely visited the case room, approached
Ms. Stephens, and stood very close to her.  Ms. Stephens whom found all of this unacceptable
complained: "She [Anastasia Angelova] is as dirty on the outside as she is on the inside."

**Supervisory Attorney Anastasia Angelova Subjects Ms. Stephens to Intense Scrutiny**

237.     In addition, Anastasia Angelova repeatedly called Ms. Stephens into her office.  The first
time, staff attorney Tifhanie Robert visited the case room and told Ms. Stephens that Anastasia
Angelova wanted to see her.  Ms. Stephens visited Anastasia Angelova in her private office on a
different work floor.  As Ms. Stephens sat in a seat across from Anastasia Angelova's desk,
Anastasia Angelova gave Ms. Stephens a long, scornful stare, and sighed before finally asking
Ms. Stephens why she thought a document was responsive.  Ms. Stephens read the document,
briefly analyzed it, and returned to the case room.

238.     On subsequent days, Anastasia Angelova continued to call Ms. Stephens into her office.
This includes another time when Tifhanie Robert informed Ms. Stephens that Anastasia Angelova
wanted to see her in her office and includes several times when Anastasia Angelova called the
case room.  Klaus Rice answered the phone and informed Ms. Stephens that Anastasia Angelova
wanted to see her in her office.  Each time, Ms. Stephens visited Anastasia Angelova and

48

analyzed documents that Anastasia Angelova shoved at her. The other employees were not subjected to the same harassing conduct by Anastasia Angelova, and were not called to Anastasia Angelova's office.

**Supervisory Attorney Anastasia Angelova Intensely Monitors Plaintiff Kalyn Stephens**

239.    On subsequent days, Anastasia Angelova called the case room, and Klaus Rice regularly answered the phone and routinely relayed messages to Kalyn Stephens, Plaintiff. Ms. Stephens also became very upset when after completing a box containing several single documents in one day, Anastasia Angelova, on the following day, called the case room and Klaus Rice relayed a message regarding "a mistake" found in Ms. Stephens' box, suggesting that Ms. Stephens made a work-related "mistake".

240.    In response to Anastasia Angelova's ongoing scrutiny of only her, Ms. Stephens complained: "She keeps getting my boxes." Around the same time, Klaus Rice reviewed a box of documents containing a similar number of single documents; however, it took him several days to complete the box, as he acknowledged. Klaus Rice stated, "She [Anastasia Angelova] respects me because I'm older." Indeed, Anastasia Angelova did not subject Klaus Rice to harassment, and he was older.

241.    However, Anastasia Angelova did not subject Alain Personna and Mahesha Mitchell to harassment although Alain Personna and Mahesha Mitchell were younger and similarly young as Ms. Stephens, and their work productivity was significantly less than Ms. Stephens' work productivity. In the case room they had been, Ms. Stephens and other Sullivan & Cromwell employees had been instructed to review a box of documents a day, and unlike most case room employees, Ms. Stephens consistently reviewed a box of documents a day.

242.    After one of Anastasia Angelova's harassing phone calls, Klaus Rice informed Ms. Stephens that Anastasia Angelova wanted Ms. Stephens to return to first level review, thereby changing her work duties, and relegating her to a position that was phased out. Anastasia

49

Angelova assigned Ms. Stephens' role to Alain Personna, whose work Ms. Stephens reviewed and received no complaints about before her harassment complaint against him. Ms. Stephens was upset and complained. Klaus Rice told her: "You're making the same amount of money as you were making before. Let's make some money."

243.     Around this time, Sullivan & Cromwell associate attorney Stephanie approached Ms. Stephens in the case room to discuss work with her and told her: "I like reviewing your work" and expressed she hesitated to change Ms. Stephens' work because "You hardly make any mistakes."

## Supervisory Attorney Anastasia Angelova Continues to Set Higher Expectations for Ms. Stephens than Sullivan & Cromwell Sets for Ms. Stephens' Peers

244.     Somewhat ironically, Anastasia Angelova visited the case room and complained to the case room employees that the client (the Willis Group) was dissatisfied because the privileged documents had not been categorized. Anastasia Angelova did not indicate who made the mistakes (although prior to this time she without hesitation highlighted Ms. Stephens' alleged work mistakes). Before exiting the case room, Anastasia Angelova emphasized: "We can't have that."

245.     When Anastasia Angelova exited the case room, Georgia Maratheftis said loudly: "Fuck," repeatedly acknowledged that she made the mistakes, and criticized the client by stating: "[Using an expletive to describe the Willis Group attorneys] are not privileged."

246.     Very shortly afterwards, Anastasia Angelova approached Ms. Stephens in the case room and placed her on a special project in which she was the only person in the case room assigned to review documents for privilege. The project involved a second level review of work for privileged documents only and required that Ms. Stephens once again review the work of other attorneys, and make revisions. The task was very stressful.

247.     For instance, Alain Personna yelled at Ms. Stephens regarding the phone volume when
Ms. Stephens was preparing to use the phone to contact Anastasia Angelova regarding her work
on the special project.

248.      In addition, Georgia Maratheftis stared at Ms. Stephens as she performed the task and, as
Ms. Stephens made revisions to her co-worker's work, Maratheftis on multiple occasions stated
in a raised voice: "You changing my work."

249.     Ms. Stephens in conducting her review continued to utilize the Willis Group attorney list
that had been previously distributed to case room employees in the case room that she and other
Sullivan & Cromwell attorneys had been, and continued to review the documents for attorney
client privilege and work product privilege, for which she received no complaints before and after
the special project.

250.     Anastasia Angelova instructed Ms. Stephens to contact her when she detected privileged
documents containing attorneys' names that had not been detected, which were instructions Ms.
Stephens and other case room employees had been previously given.  Ms. Stephens contacted
Anastasia Angelova when she made the findings, and Ms. Stephens even alerted Anastasia
Angelova when she suspected a compliance employee was acting in an attorney role.  Ms.
Stephens and Anastasia Angelova communicated several times over the phone and in the case
room regarding the special project.

251.     Ms. Stephens felt uncomfortable when after a phone call, Anastasia Angelova quickly
arrived in the case room, stood very closely behind Ms. Stephens' chair, pressing against Ms.
Stephens' chair while hovering over her.  On one occasion as Ms. Stephens finished speaking
with Anastasia Angelova over the phone, Sullivan & Cromwell supervisor Georgia Maratheftis
once again harassed Ms. Stephens by stating: "You don't like Anastasia."

252.     Ms. Stephens presumes her work on her special project was satisfactory because the
attorney list was updated to include Ms. Stephens' findings, including the compliance employee's
name that she had detected and an updated privilege list was distributed to other Sullivan &

Cromwell attorneys. Ms. Stephens did not receive any complaints regarding her work on the special project, and when she finished reviewing the other attorneys' work, she returned to first level review.

## Sullivan & Cromwell Supervisory Attorney Anastasia Angelova Subjects Ms. Stephens to Physical Threats

253.     Before and after Ms. Stephens' work on her special project, Anastasia Angelova made Ms. Stephens feel extremely uncomfortable.

254.     For example, several times, Anastasia Angelova visited the case room, stood very close to Ms. Stephens and, as Ms. Stephens remained seated at her work table, Anastasia Angelova reached across Ms. Stephens' body while narrowly avoiding contact with Ms. Stephens' arm and hand, causing Ms. Stephens to suffer emotional distress.

255.     Mahesha Mitchell, one of several case room employees whom witnessed multiple episodes, told Ms. Stephens: "You are nice" and indicated that she would defend herself against Anastasia Angelova's abuse.

256.     After she witnessed another episode, Mahesha Mitchell expressed to Ms. Stephens: 'Where you are from they let people get away with the way law enforcement treat people on the show Cops.' Mahesha Mitchell added, "They do that down there. In New York, we don't let people get away with treating us that way." Anastasia Angelova did not subject other case room employees to this type of mistreatment.

257.     Anastasia Angelova's physical threats intimidated Ms. Stephens because Ms. Stephens witnessed Anastasia Angelova's aggression towards another employee.

258.     For example, while seated in the case room she had been, Ms. Stephens witnessed the following: Sullivan & Cromwell staff attorney Tifhanie Robert exclaimed, "Anastasia, what more do you want? What more do you want, Anastasia?" Anastasia Angelova, whom had been

standing close to Tifhanie Robert and while facing her, moved aggressively closer to Tifhanie
Robert.

259.     On another day while sitting in the case room she had been, Ms. Stephens also observed
the following:  Anastasia Angelova upon entering the case room and walking aggressively
towards Tifhanie Robert state to Tifhanie Robert in a hostile tone: "Why you looking at me that
way."

260.     During the relevant time period, a reliable source told Ms. Stephens: "She [Anastasia
Angelova] is going around saying that she fired Tifhanie."

261.     Ms. Stephens is aware that Tifhanie Robert, whom was Ms. Stephens' only black
supervisor during the Willis Group project, had stopped working on the Willis Group matter, and
had been replaced by Jamie Bunyan, whom is white and occupied Tifhanie Robert's former work
seat in or around Fall 2004.

### Supervisory Attorney Anastasia Angelova Shows Favoritism against Ms. Stephens

262.     During Fall 2004, Ms. Stephens continued to be harassed by Anastasia Angelova even
during Ms. Stephens' non-working days.

263.     For instance, Ms. Stephens missed three consecutive days of work during the fall season
and was harassed by Sullivan & Cromwell agents even while she was away from work.  Although
Ms. Stephens notified Sullivan & Cromwell's staffing agency Update Legal each day that she
was sick and would not be coming in to work, Update Legal called Ms. Stephens multiple times
on each day after Ms. Stephens placed her initial phone calls indicating that she would not be
coming into work.

264.     Update Legal repeatedly contacted Ms. Stephens and expressed on several days:
"Anastasia wants to know if you are coming back."

265.     In separate phone calls, Sullivan & Cromwell's agent Update Legal demanded:
"Anastasia needs to know when you are coming back."  Ms. Stephens had not failed to go to

work any workdays prior to Fall 2004. Ms. Stephens believes Anastasia Angelova did this to cause Ms. Stephens emotional distress, which it did, and to pressure Ms. Stephens to quit her work at the firm. Unfairly, Anastasia Angelova was very accommodating to other case room employees' vacation requests and disability-related absences.

266.    For example, Anastasia Angelova had approved Georgia Maratheftis' two-week summer vacation to Greece and Georgia Maratheftis missed two consecutive work weeks during the 2004 Summer Olympics in Greece.

267.    Upon information and belief, Georgia Maratheftis began working on the Willis Group project less than a month before Ms. Stephens began working at Sullivan & Cromwell LLP in June 2004. In addition, Georgia Maratheftis stated that prior to the Willis Group project, she had worked only one day at the firm.

268.    Ms. Stephens witnessed as Anastasia Angelova happily approved Georgia Maratheftis' vacation request as Ms. Stephens walked pass the two during her break. When Georgia Maratheftis returned to the case room, she announced that her vacation request had been approved.

269.    Mahesha Mitchell also went away long periods, including several weeks and days. Mahesha Mitchell reportedly missed several consecutive workdays because she sustained an injury from an automobile accident (However, Georgia Maratheftis and her subordinates repeatedly expressed otherwise).

270.    During Fall 2004 and after Ms. Stephens returned to work, Mahesha Mitchell stated that she was going away to Florida for several weeks and indicated that her time off was easily approved, and Mahesha Mitchell did not come to work several days.

271.    In addition, associate Anastasia Angelova also missed several workdays. Georgia Maratheftis announced the times Anastasia Angelova took vacations, which were at least two multiple week vacations, one vacation occurred during the summer of 2004 and another vacation occurred in or around December 2004.

272.     This is in addition to the other days Anastasia Angelova did not come to work, including the day Georgia Maratheftis reported Anastasia Angelova did not come to work to attend her husband's graduation.  Anastasia Angelova did not visit the case room during these times.

273.     In the presence of Sullivan & Cromwell associates, Anastasia Angelova falsely appeared to be unbiased against Kalyn Stephens, Plaintiff.

274.     For example, during her breaks, Ms. Stephens observed Anastasia Angelova with associate Tracy High, who upon information and belief, was the only black associate attorney at Sullivan & Cromwell LLP.  During these times, Anastasia Angelova's comments and behavior toward Ms. Stephens were always cordial.

275.     For example, Anastasia Angelova in the presence of associate Tracy High regularly smiled at Ms. Stephens, greeted her, and complimented her attire.  In addition, during Anastasia Angelova's visits in the case room with associate Tyler Smith, Anastasia Angelova behaved civilly.  However, Ms. Stephens also did not like Tyler Smith's harassment of her (as discussed above).

**Supervisory Attorney Anastasia Angelova Facilitates the Harassment of Ms. Stephens**

276.     During one of her routine visits to the case room, Sullivan & Cromwell senior associate attorney Anastasia Angelova witnessed an episode of her subordinate Mahesha Mitchell, whom is Caribbean, shout at Ms. Stephens without provocation: "That's not a responsive document."  The case room had been quiet before Mahesha Mitchell began harassing Ms. Stephens at that time.

277.     During a subsequent visit, and as Anastasia Angelova paced across the floor near Mahesha Mitchell in the Willis Group case room, Anastasia Angelova stated, "Ain't that right, Mahesha."  Mahesha Mitchell replied, "Yeah."  Prior to Anastasia Angelova's unprofessional comment, the case room was silent.

278.     Ms. Stephens believes the discrimination against her was orchestrated because among other things Mahesha Mitchell was assigned a second level review role since she began working

on the Willis Group matter and during the period Anastasia Angelova changed Ms. Stephens' work duties from second level review to first level review that was eventually phased out.

279.     In addition, on a later date, Sullivan & Cromwell's staffing agent Sandrene Ryan of De Novo Legal told Ms. Stephens: "Anastasia is always requesting Mahesha back [to work at the firm]."

280.     At no time, did Anastasia Angelova separate Ms. Stephens from the people whom harassed her and she complained about. This allowed the harassment discrimination of Ms. Stephens to fester.

## Supervisory Attorney Anastasia Angelova Terminates Employee for Offending Her and Whom Thwarted Harassment of Plaintiff Kalyn Stephens

281.     On a different occasion, Anastasia Angelova visited the case room twice as Ms. Stephens sat alone in the case room after a dinner break. The first time, Anastasia Angelova walked aggressively in the case room and did not utter a word. Instead, as Ms. Stephens sat in her seat, Anastasia Angelova reached across Ms. Stephens' body, began turning the document pages that lay in front of Ms. Stephens while barely avoiding making physical contact with Ms. Stephens again.

282.     Just minutes later, Anastasia Angelova visited the case room again and was unusually cordial to Ms. Stephens as she kneeled very close to her, and attempted to gather information to fire contract attorney David. During this time, Anastasia Angelova asked Ms. Stephens a question regarding David's work productivity. Ms. Stephens believes Georgia Maratheftis informed Anastasia Angelova that Ms. Stephens intervened in her [Georgia Maratheftis'] unwarranted criticism of David's work (as explained in greater detail below). Ms. Stephens replied to Anastasia Angelova by stating, "I'm not sure."

283.     Next, Anastasia Angelova walked to David's work table and began perusing the documents that lay on his work table. Initially, Georgia Maratheftis complained that contract attorney David's work productivity was low.

284.     For instance, in the case room where Georgia Maratheftis and the contract attorneys had been, Georgia Maratheftis, whom at the time worked as a contract attorney and during a time supervisory attorney Tiffanie Robert exited the case room, Georgia Maratheftis abruptly exited her work seat creating a loud, disruptive noise as Ms. Stephens worked, walked aggressively towards the box where David's work lay, began turning the document pages, and complained that David's work productivity was low. Ms. Stephens whom was startled and distracted by the sound of Georgia Maratheftis' chair and behavior reacted by stating, "He just started [working on the Willis Group matter]." Georgia Maratheftis replied that contract attorney David had previous insurance experience, suggesting that his productivity was subpar.

285.     Contract attorney David thwarted the harassment of Ms. Stephens and openly expressed contrary viewpoints, including views that differed from Ms. Stephens' thoughts and opinions.

286.     For example, on one of many occasions, Alain Personna commented that Ms. Stephens like having space. Shortly thereafter, Georgia Maratheftis asked Ms. Stephens if she was an only child. Ms. Stephens did not reply. However, contract attorney David replied and indicated that Ms. Stephens might like having space because she might have had to share with siblings.

287.     Ms. Stephens also felt uncomfortable when during the hostile and distracting interrogation of contract attorney David in the case room, Anastasia Angelova's subordinate subjected contract attorney David to unwarranted scrutiny regarding his work productivity, suggesting that it was unacceptable. Ms. Stephens reviewed a lot of David's work during her special project and his accuracy was high. Ms. Stephens made only one change to David's work and consulted him before making the change, as David was competent. Ms. Stephens decided to categorize the subject document as privileged because Anastasia Angelova had emphasized that the Willis Group was not satisfied with Sullivan & Cromwell LLP's work.

288.     Alain Personna who was present during the hostile and distracting interrogation of
contract attorney David expressed that Anastasia Angelova fired David because he [Alain
Personna] believed that David intentionally mispronounced Anastasia Angelova's name,
suggesting that he believed that David was not fired because of poor work performance, which
Ms. Stephens too had concluded.

289.     Ms. Stephens believes contract attorney David's mispronunciation of Anastasia
Angelova's name is less severe than all of the inappropriate behavior and harassment that Ms.
Stephens experienced and complained, as contract attorney David had limited contact with
Anastasia Angelova whom worked on a different floor, had her own private office like many of
the associates who were disproportionately non-black, and contract attorney David spent a lot of
time in the case room, whereas Ms. Stephens was subjected to numerous harassment and
inappropriate behavior by multiple employees on a near-daily basis whose work she reviewed and
whom she shared a case room that had no windows for several months. More specifically,
Anastasia Angelova's private office, which had a window and a view of the out door, was a size
similar to the windowless room that Ms. Stephens shared with six attorneys that had been
subdivided by a partition to create an even smaller workspace.

290.     On a different day, and after Georgia Maratheftis and contract attorneys had been moved
from the original case room, and while Ms. Stephens waited outside for her car service ride,
Georgia Maratheftis stated in a stern, raised voice: "I didn't like the way David talked to me".
Georgia Maratheftis did not elaborate. Ms. Stephens believes Georgia Maratheftis became upset
during the times contract attorney David expressed contrary viewpoints and thwarted the
harassment of Ms. Stephens because when Ms. Stephens expressed contrary viewpoints, Georgia
Maratheftis angrily screamed at her multiple times: "Do you think I'm stupid."

291.     Ms. Stephens believes that Sullivan & Cromwell contract attorney David was fired
because he offended Anastasia Angelova and Georgia Maratheftis whom are both white and
European. In contrast, Ms. Stephens' complaints were ignored, not investigated and/or never

taken seriously. Therefore, Ms. Stephens believes Sullivan & Cromwell LLP did not properly address her harassment discrimination complaints because of her race (black), national origin (American), and ethnicity (African American).

**Supervisory Attorney Anastasia Angelova Subjects other Employees to Less Scrutiny and Sullivan & Cromwell Promotes Them**

292.     Anastasia Angelova whom routinely visited the case room at least once a day subjected other employees to less scrutiny. During several visits, Anastasia Angelova singled out Ms. Stephens for mistreatment and subjected her to embarrassment, ridicule, and criticism in the presence of other employees. During other times, Anastasia Angelova announced that other case room employees were doing a good job, which was false.

293.     For example, one morning shortly after Ms. Stephens arrived to work and sat alone in the case room with Alain Personna, Anastasia Angelova visited the case room and while looking at Ms. Stephens asked: "Where is Georgia and Klaus?" Ms. Stephens did not respond because she did not know. Alain Personna replied: "They are on the way." Then Anastasia Angelova stormed out of the case room. During the relevant time period, a reliable source told Ms. Stephens that Anastasia Angelova complained that Sullivan & Cromwell employees arrived to work late and Anastasia Angelova added: "That's how I got to be where I am." Ms. Stephens re-alleges that Sullivan & Cromwell LLP did not hire her for an associate position because she is black.

294.     However, at no point did supervisory attorney Anastasia Angelova complain in the case room where Ms. Stephens worked. Instead, Anastasia Angelova whom had regularly called the case room to single out Ms. Stephens, called the case room on one occasion to speak with Georgia Maratheftis, whom routinely arrived late for work, regarding a full-time permanent attorney position at the firm. Ms. Stephens believes that this scenario was orchestrated by Anastasia Angelova to further annoy and discriminate against Ms. Stephens and try to get her to

59

quit her work at the firm, because among other things, Georgia Maratheftis repeatedly harassed Ms. Stephens before and after her promotion, and during previous and subsequent phone calls, Anastasia Angelova had only singled out Kalyn Stephens, Plaintiff.

295.     Upon Georgia Maratheftis exiting the case room after Anastasia Angelova's phone call regarding her, another contract attorney immediately complained: "She's going to make her [Georgia Maratheftis] our supervisor." In addition to routinely arriving late for work before and after her promotion, her poor work performance, poor work ethic, and ongoing harassment of Ms. Stephens, Georgia Maratheftis repeatedly violated Sullivan & Cromwell LLP's dress policy.

296.     For instance, Georgia Maratheftis routinely wore spandex pants and athletic gear to work. During work hours and in the summer of 2004, the firm's staffing agency Update Legal held a meeting to discuss Sullivan & Cromwell LLP's dress policy. Update Legal verbally and in writing reiterated that spandex and athletic wear were prohibited. Georgia Maratheftis, whom at that time was a Sullivan & Cromwell contract attorney and an employee of Update Legal, attended the meeting with Ms. Stephens and Alain Personna. Yet, Georgia Maratheftis routinely violated Sullivan & Cromwell LLP's dress policy after the meeting.

297.     Additionally during the relevant time period, a reliable source also told Ms. Stephens that Anastasia Angelova complained to Sullivan & Cromwell legal assistant Jamie Bunyan that contract attorney Adam, and then-contract attorney Kevin Lencki were working too slowly, and Anastasia Angelova requested that Jamie Bunyan fire Kevin Lencki and Adam. However, Jamie Bunyan was reluctant and replied: "They just started."

298.     Ms. Stephens believes this to be true because she observed in the case room that Kevin Lencki's work productivity was consistently low before and after his promotion to a full-time permanent attorney position at Sullivan & Cromwell LLP. Ms. Stephens believes that Anastasia Angelova did not single out Kevin Lencki and Adam in the Willis Group case room because they are white and male.

299.     Although Ms. Stephens reviewed a box of documents each day as instructed, Kevin

Lencki rarely, if ever reviewed a box of documents a day.  Instead, Sullivan & Cromwell

supervisory attorney Kevin Lencki whom sat in the seat next to Alain Personna in the Willis

Group case room, routinely read the newspapers, discussed stocks with Alain Personna near the

Willis Group documents which also contained financial data, and regularly discussed non-work

related topics.

300.     Despite Kevin Lencki's poor work performance, he was promoted to a full-time

permanent position during the Willis Group project.  Kevin Lencki bragged about his promotion

among other things and told Ms. Stephens that his friend Matt, a Sullivan & Cromwell associate,

whom is one of many white associate attorneys at Sullivan & Cromwell LLP recommended him

for his promotion at the firm.

**Supervisory Attorney Anastasia Angelova Subjects Ms. Stephens to Offensive Staring**

301.     On a Saturday, Anastasia Angelova sat in the seat next to Ms. Stephens in close

proximity to her, turned in the direction facing Ms. Stephens, mocked Ms. Stephens' demeanor as

Ms. Stephens worked in the case room, and stared at Ms. Stephens' body for several hours,

including but not limited to staring at Ms. Stephens' vagina area for a prolonged period in the

presence of other employees in the case room.  Ms. Stephens, who was offended by Anastasia

Angelova's unwanted and unwelcomed attention of her, recrossed her legs.  Anastasia Angelova

immediately crossed her legs while still facing Ms. Stephens and staring at her.  Ms. Stephens

was humiliated and felt as though Anastasia Angelova viewed her as an object and not worthy of

protection of harassment discrimination.

302.     The following week, contract attorney Klaus Rice whom witnessed Anastasia Angelova's

offensive staring stated: "Anastasia was staring at you, Ms. Kalyn." Ms. Stephens who was still

disgusted replied in the case room: "She was staring at me as if she didn't have a husband."

Klaus Rice, Sullivan & Cromwell staff attorney Kevin Lencki and other case room employees laughed, subjecting Ms. Stephens to further humiliation.

303.     Sullivan & Cromwell staff attorney Georgia Maratheftis repeated Ms. Stephens' response while mocking Ms. Stephens' southern accent. Then Georgia Maratheftis immediately confronted Ms. Stephens again by stating: "You don't like Anastasia." Ms. Stephens replied: "I don't like the way Anastasia treats me." Georgia Maratheftis replied: "Anastasia is all about business when she is in this room." Ms. Stephens did not respond although Anastasia Angelova did not perform any work during the multiple hours she stared at Ms. Stephens in the Willis Group case room.

304.     This is in addition to the excessive breaks Anastasia Angelova took during the workweek. Previously, after one of many times when Anastasia Angelova subjected Ms. Stephens to unfair treatment, Ms. Stephens complained in the case room: "I don't think she [Anastasia Angelova] has enough work to do."

305.     Ms. Stephens saw Anastasia Angelova a lot during her breaks. She routinely waived at Ms. Stephens and greeted her. Ms. Stephens greeted her back and walked swiftly away from her and sometimes in the opposite direction. In addition, a contract attorney repeatedly reported seeing Anastasia Angelova during his cigarette breaks, which Ms. Stephens did not take. Another contract attorney reported seeing Anastasia Angelova during her breaks. She told Ms. Stephens that she saw Anastasia Angelova with another Sullivan & Cromwell attorney Tracy High and Anastasia Angelova was "sweet" to her. Ms. Stephens replied: "She was nice to me when she was with her too." Ms. Stephens had expressed to her co-worker that during other times "Anastasia gave me a hard time."

306.     The contract attorney told Ms. Stephens that Anastasia Angelova fired her friend and indicated that her friend is a minority. Anastasia Angelova did not subject Sullivan & Cromwell attorney Kevin Lencki who is a white male to this type of treatment, although he routinely engaged in inappropriate and unprofessional behavior, distracted Ms. Stephens and his work

productivity was consistently low before and after his promotion to a full-time permanent
position at the firm.

307.      Additionally, as Ms. Stephens was leaving work at Sullivan & Cromwell LLP's
headquarters at 125 Broad Street, Anastasia Angelova hurried to catch up with her and walked
closely behind her while staring intensely at Ms. Stephens' body again as Ms. Stephens exited the
building.

308.      During Anastasia Angelova's subsequent visit to the case room and while walking
aggressively towards Ms. Stephens, Anastasia Angelova looked at her with contempt and berated
Ms. Stephens by stating: "Why you looking at me that way." (This is the same hostile behavior
Ms. Stephens observed Anastasia Angelova subject Sullivan & Cromwell staff attorney Tifhanie
Robert who is black.)

309.      Shortly afterwards, Ms. Stephens complained to Sullivan & Cromwell senior staff
attorney Dawn Samuel. Dawn Samuel told Ms. Stephens: "You're sweet." She continued by
telling Ms. Stephens that she was aware that Anastasia Angelova had also subjected staff attorney
Tifhanie Robert to harassment.

310.      Dawn Samuel expressed similarly as Tifhanie Robert, and another Sullivan & Cromwell
co-worker, and as Ms. Stephens observed: 'Other associates do not visit the case room like
Anastasia.' Dawn Samuel, who is Caribbean black, also stated that Anastasia Angelova asked
her while mocking Anastasia Angelova's voice: "You wanna come work for me?" Then Dawn
Samuel told Ms. Stephens in a raised voice: "I don't wanna work with [Anastasia Angelova's]
crazy ass. She's crazy."

311.      When Anastasia Angelova visited the Willis Group case room again in or around
December 2004, Klaus Rice, who was present during Ms. Stephens' multiple complaints
regarding Anastasia Angelova's mistreatment of her and whom had not been subjected to
harassment by Anastasia Angelova, requested that Anastasia Angelova stop visiting the case

room. He specifically told her: "We don't need you." Anastasia Angelova stopped visiting the case room.

## Supervisory Attorney Anastasia Angelova Continues to Belittle Ms. Stephens

312.        In December 2004, staff attorney Georgia Maratheftis announced that Anastasia Angelova was hosting a Christmas party in the office. Ms. Stephens arrived late for the Christmas party and as she approached the conference room, she heard Anastasia Angelova say: "Somebody help Kalyn." As Ms. Stephens sat in the meeting (it was not a Christmas party or any party), Anastasia Angelova while fumbling with her Blackberry sighed and stated: "This [the Willis Group] project could go for a long time."

313.        Previously, in the case room, Georgia Maratheftis had also repeatedly announced the same. In addition, and after one of Ms. Stephens' complaints and prior to the meeting, Georgia Maratheftis while staring at Ms. Stephens stated in a raised voice: "It could go for years." Ms. Stephens believes that the entire scenario was orchestrated to try to get her to quit her work at the firm.

## Supervisory Attorney Anastasia Angelova Retaliates again and Fires Ms. Stephens

314.        On or around January 11, 2005, Anastasia Angelova called the case room and requested that Ms. Stephens, Klaus Rice, and Adam visit her office. As Ms. Stephens stood near Klaus Rice and Adam, both of whom had thwarted the harassment of Ms. Stephens and who performed similar work duties as her, Anastasia Angelova announced that their work on the Willis Group project had ended and manufactured a business reason. However, Sullivan & Cromwell LLP retained Georgia Maratheftis, Alain Personna, Kevin Lencki, and Mahesha Mitchell whom did not attend the meeting and continued to work on the Willis Group matter.

315.        When Ms. Stephens, Klaus Rice and Adam returned to the case room, Klaus Rice exclaimed: "She let us go on a Tuesday" and expressed that Anastasia Angelova "could have let us go on a Friday". At that time, Georgia Maratheftis told Klaus Rice to speak with Sullivan &

Cromwell legal assistant Jamie Bunyan, whom had replaced Tifhanie Robert's role on the project and whom had also occupied Tifhanie Robert's former work seat.

316.     As Ms. Stephens was gathering her things, Georgia Maratheftis asked her, "How you gonna pay your rent?" Ms. Stephens reiterated, "I'm not sure." Mahesha Mitchell whom had repeatedly ridiculed Ms. Stephens' religion stated mockingly, "God will make a way."

317.     Ms. Stephens took a break and called Sullivan & Cromwell's staffing agency Update Legal. She spoke to Update Legal's recruiter Wendy Pearson and told her that her work on the project had ended and asked her to find work for her. Wendy Pearson informed Ms. Stephens that she would contact Jamie Bunyan to confirm that her project had ended. Ms. Stephens returned to the case room and gathered her things. Mahesha Mitchell followed Ms. Stephens out of Sullivan & Cromwell LLP's headquarters at 125 Broad Street.

318.     On or around January 13, 2005, Sullivan & Cromwell's staffing agency Update Legal contacted Ms. Stephens regarding project work at the law firm of O'Melveny & Myers. The firm's associates interviewed Ms. Stephens for the project.

319.     On or around January 18, 2005, Ms. Stephens began a document review project for the firm. The project was different because the firm's partner visited the case rooms regularly. Ms. Stephens also saw the partner several times in the building and outside the building at Starbucks, where he asked her personal questions.

320.     During this time, Update Legal's female recruiters visited the law firm and Ms. Stephens observed the female recruiters' flirtatious conduct with Ms. Stephens' male co-workers. The inappropriate and unprofessional conduct caused Ms. Stephens to feel uncomfortable.

321.     Also during this time, Ms. Stephens contacted Update Legal via phone regarding her medically related extended breaks. Several times, she informed the firms' agency that she was taking an extended break for a doctor appointment. Update Legal staffing agency probed her. When Ms. Stephens described her medical condition which did not exist in 2003 before Ms.

Stephens worked at Sullivan & Cromwell LLP, Update Legal repeated her medical condition and laughed. This caused Ms. Stephens to feel offended and humiliated.

322.     Also around this time, Ms. Stephens was subjected to criticisms regarding sub categorization of relevant documents. The firm's associate and Ms. Stephens' supervisor summoned her away from her work seat and she met with her in her office.

323.     Shortly thereafter, the same associate visited the case room again and Ms. Stephens followed her to her private office again, where she critiqued Ms. Stephens' sub categorization of relevant documents while becoming more condescending. The other contract attorneys were not treated in this manner.

324.     Also during this time period, Ms. Stephens was subjected to unwarranted scrutiny by the firm, including but not limited to a 15-minute deduction on one of her timesheets by one of the firm's several white associates. For example, Ms. Stephens routinely completed a timesheet and submitted it for approval by one of the firm's associates. When Ms. Stephens received one of her timesheets, she observed that it contained a markup for 15 minutes and had been signed by one of the firm's associates. Ms. Stephens was not given an explanation. Ms. Stephens who believed that she had been singled out complained and a co-worker informed her to contact Update Legal.

325.     A co-worker whom Ms. Stephens complained that she was looking for full-time employment informed her that a friend who is black worked at a law firm for several years and was fired when he made one mistake. In addition, the co-worker whom is black complained that Update Legal failed to pay her the rate that she had been promised.

326.     Another co-worker who is black had repeatedly expressed that she did not want to work as a lawyer again because in the law firm she had worked, she was subjected to a lot of screaming by her supervisory attorney. She described the harassment on several days.

327.     On or around April 12, 2005, Ms. Stephens was informed that her work on the firm's document review matter ended, and that she would not be retained for the next phase of the project unlike other contract attorneys. Ms. Stephens was not provided a reason.

66

328.     On or around April 15, 2005 to April 28, 2005, Ms. Stephens began to work for Sullivan
& Cromwell's staffing agency De Novo Legal on the Sprint/Nextel Merger for the law firm of
Cravath Swaine & Moore. De Novo Legal's contract attorney Joanne who is white informed Ms.
Stephens that she had worked on the Willis Group matter at Sullivan & Cromwell LLP and stated
that she worked with Georgia [Maratheftis], Alain [Personna], and Kevin [Lencki], suggesting
that they were her supervisors. She provided an accurate description of Kevin Lencki. This
shows the business reason that Sullivan & Cromwell LLP had proffered for the termination of
Ms. Stephens is bogus and a pretext. This is the extent Ms. Stephens and Joanne discussed
Sullivan & Cromwell LLP and any of its clients.

329.     In addition, in or around April 2005, another contract attorney who is black and whom
worked on a different Sullivan & Cromwell LLP matter during the relevant time period that Ms.
Stephens had initially worked for Sullivan & Cromwell LLP informed Ms. Stephens that Sullivan
& Cromwell associate attorneys Anastasia Angelova and Tracy High had invited the contract
attorney and a group of contract attorneys out for drinks and offered them positions as Litigation
Assistants (staff attorneys) at the firm.

330.     Ms. Stephens believes and therefore alleges Sullivan & Cromwell LLP's firing of her is
pretextual as evidenced by the close temporal proximity between her harassment complaint, a
decline in her work evaluations and satisfaction with her work performance, and the change in her
work duties.

**Another Sullivan & Cromwell Supervisory Attorney Subjects Ms. Stephens to Sexual
Harassment and Sullivan & Cromwell Retaliates against Plaintiff again - Summer 2005**

331.     From the first week Ms. Stephens returned to work at Sullivan & Cromwell LLP, another
Sullivan & Cromwell supervisory attorney subjected Ms. Stephens to continuing harassment
because of her sex.

332.     In or around August 2005, and on the first day Ms. Stephens returned to work at Sullivan & Cromwell LLP's headquarters, her supervisor introduced himself to her as "Mark". As Ms. Stephens followed Sullivan & Cromwell supervisory attorney "Mark" to the work floor where she would be working, he told her: "You dress well." Ms. Stephens had never met supervisory attorney "Mark" or worked with him prior to this. This made her feel uncomfortable. Supervisory attorney "Mark" continued speaking to Ms. Stephens as she followed him to the elevator and to the work table where he indicated she would be working.

333.     On the next day, and as Ms. Stephens was taking a break away from the work table, Sullivan & Cromwell supervisory attorney "Mark" approached her and told her: "You dress very well. You can get a job." Ms. Stephens felt very uncomfortable. As she attempted to walk away, supervisory attorney Mark obstructed her path. Ms. Stephens had not discussed finding a full-time permanent position with him.

334.     Shortly afterwards and on a subsequent day, and as Ms. Stephens took a break away from the work table, Sullivan & Cromwell supervisory attorney "Mark" approached her again and repeated, "You dress very well. You can get a job," and again obstructed Ms. Stephens' path as she attempted to walk pass him, causing her to feel extremely uncomfortable and humiliated.

335.     Next, as Ms. Stephens sat at the work table, Sullivan & Cromwell supervisory attorney "Mark" continued to humiliate and distract her by yelling across the open workspace in the presence of other Sullivan & Cromwell employees: "Kalyn, you placed a cup containing liquid in the trash." When Ms. Stephens looked up, she observed that supervisory attorney "Mark" had a very angry look on his face. Ms. Stephens had disposed a cup containing ice during a time she exited her work seat. Ms. Stephens felt as if she was being watched. Ms. Stephens found her supervisor's actions to be demeaning in a professional setting.

336.     During another time as Ms. Stephens worked, Sullivan & Cromwell supervisory attorney "Mark" yelled across the room in a state of rage: "Kalyn, you missed a privileged document."

68

When Ms. Stephens looked up, supervisory attorney "Mark" had an angry look on his face and his face looked very red. This also frightened Kalyn Stephens, Plaintiff.

337.    Ms. Stephens' co-worker whom occupied a seat at the same work table as Ms. Stephens began telling her among other things: "They know each other. They talk. They probably have been talking about you." Although Ms. Stephens had not discussed Sullivan & Cromwell associate Anastasia Angelova with her co-worker, Ms. Stephens' co-worker told her: "Anastasia should have hired you," and stated among other things: "She took you through a lot", indicating that Sullivan & Cromwell supervisory attorney Anastasia Angelova's hostile treatment of Ms. Stephens during the Willis Group project at Sullivan & Cromwell LLP was excessive and severe. Ms. Stephens was not aware that her co-worker had knowledge that she [Ms. Stephens] had worked with Sullivan & Cromwell associate attorney Anastasia Angelova.

338.    Shortly afterwards and less than two weeks after beginning her assignment, Sullivan & Cromwell supervisory attorney "Mark" yelled across the room again: "Kalyn, you missed a privileged document." At that time, Ms. Stephens observed Sullivan & Cromwell partner Suhana Han whom had previously visited the workspace (and subjected Ms. Stephens to unwanted and unwelcomed staring) standing near supervisory attorney "Mark" and document boxes.

339.    On that same day, and as Ms. Stephens waited for her car service ride at the work table, Sullivan & Cromwell's staffing agency Update Legal called Ms. Stephens to terminate her employment. Ms. Stephens whom had answered her cell phone at the work table demanded an explanation in the presence of partner Suhana Han. Ms. Stephens stated: "Why am I being fired?" Update Legal did not provide an explanation. Ms. Stephens believes she had been fired because she did not acquiesce to her supervisor's unwanted and unwelcomed attention her.

340.    Afterwards, Update Legal called Ms. Stephens back and told her that the employment termination of her was "a mistake." The following workday, as Ms. Stephens took a break from the work table, Sullivan & Cromwell supervisory attorney "Mark" approached her, stood very close to her, and apologized. Ms. Stephens was still upset. She walked away to escape him.

341.     Yet, on another day, as Ms. Stephens took a break, supervisory attorney "Mark"
approached her again on the work floor and apologized. Ms. Stephens still did not (and still does
not) forgive him. Ms. Stephens walked away again to escape him.

342.     Less than two weeks after Ms. Stephens returned to work at Sullivan & Cromwell LLP,
Update Legal called her back to end her work. Ms. Stephens believes she had been fired again
because she complained.

343.     Upon information and belief, Sullivan & Cromwell LLP fired supervisory attorney
"Mark" shortly after his discrimination against Kalyn Stephens, Plaintiff. Later, supervisory
attorney "Mark" worked for Sullivan & Cromwell's staffing agency De Novo Legal on the same
floor as De Novo Legal's client services representative Sandrene Ryan at the De Novo Legal
office on Fifth Avenue in Manhattan.

## Sullivan & Cromwell Attorneys Subject Plaintiff Kalyn Stephens to an Offensive Work Environment Again Because of Plaintiff's Sex and Gender - Fall 2005

344.     In or around September 2005, Sullivan & Cromwell's staffing agency Strategic Legal
Solutions recruited Ms. Stephens to work on a Sullivan & Cromwell matter at its office.

345.     Sullivan & Cromwell associate Matt, a friend of staff attorney Kevin Lencki and Ms.
Stephens' supervisor during the Willis Group matter, managed the document review project at the
office of Strategic Legal Solutions. On one occasion, as Ms. Stephens walked towards the exit of
the break room, Sullivan & Cromwell associate and Ms. Stephens' supervisor Matt entered the
break room and began using the office phone to contact Sullivan & Cromwell. As supervisory
attorney Matt spoke with the recipient via the speaker phone, he began the phone call by stating
Ms. Stephens' name and indicating she had been in the break room with him.

346.     Around that time, Sullivan & Cromwell contract attorney Peter Fish whom occupied a
seat at the same work table as Ms. Stephens, asked her several times to go on dates with him, all
thinly veiled solicitations for sex.

347.     On one occasion, as Ms. Stephens ate her food in the office, Peter Fish told her: "Don't ruin your nice figure."

348.     During another time, and as Ms. Stephens was taking a break outside of the building away from him, Peter Fish invited her to Central Park with him. This is in addition to the other times he invited Ms. Stephens on dates. During a subsequent Sullivan & Cromwell LLP case, Peter Fish continued to ask Ms. Stephens on dates, which she had no interest.

349.     During this time, Sullivan & Cromwell contract attorney Jill Chenault who was suspended from the bar during the relevant time period began to harass Kalyn Stephens, Plaintiff.

350.     Prior to working on the Sullivan & Cromwell matter which began in or around September 2005, Sullivan & Cromwell attorney Jill Chenault's bar license was suspended. The Michigan Attorney Discipline Board issued a Notice of Suspension and Restitution dated March 21, 2005, designating a 1-year suspension with regard to Jill Chenault, which was effective March 19, 2005 (Notice of Suspension and Restitution, attached hereto as Exhibit "A"). Therefore, Ms. Stephens alleges that Sullivan & Cromwell LLP and its staffing agency Strategic Legal Solutions knew or should have known about the bar suspension of an attorney in their employ.

Shearman & Sterling LLP Discriminates

351.     During Summer 2005, Plaintiff returned to work for the law firm of Shearman & Sterling on a document review matter. Associate Christina Wilson was her direct supervisor again. Once again, Plaintiff sat in a case room that did not have a window. Christina Wilson provided directions and instructions regarding Plaintiff's assignment.

352.     Plaintiff's role involved the review of documents for confidentiality, relevancy and privilege for a telecommunications matter. When Plaintiff asked Christina Wilson if an attorney-client privilege list was available, Christina Wilson interrupted Plaintiff as she spoke and responded to her in a hasty tone, suggesting that she was annoyed. Eventually, she provided Plaintiff a privilege list.

353.     During other times, Christina Wilson and other associates were hostile when communicating with Kalyn Stephens, Plaintiff. They did not subject other contract attorneys to this type of harsh treatment.

354.     One day shortly after Plaintiff arrived to work, Christina Wilson approached Plaintiff and told her that she should have received an e-mail indicating that she should have not returned to work that day. Pursuant to her contract, Plaintiff had expected to work that day.

355.     Plaintiff had not checked her e-mail prior to arriving to work. Afterwards when Plaintiff checked her personal e-mail address, she had received an e-mail from Christina Wilson indicating that she should have not returned to work that day. Soon afterwards and less than four hours after arriving for work, Plaintiff left work (and had been paid less than four hours on that day and on other days).

356.     However, several contract attorneys had been working (or were) in the case room that day. This includes contract attorney Brian Ceballo whom had repeatedly approached Plaintiff and subjected her to unwanted and unwelcomed attention of her. This occurred multiple days.

357.     Several times as Brian Ceballo distributed work assignments, he was very difficult to communicate with often reversing the instructions he provided Kalyn Stephens, Plaintiff. This is in addition to the non-work related conversations that he attempted to strike up with Plaintiff, which distracted her, and she had no interest. Plaintiff repeatedly complained to contract attorney Uzoma Ubanii that Brian Ceballo troubled her and she felt uncomfortable working with him. Uzoma Ubanii expressed that Brian Ceballo liked her. However, Plaintiff had no interest in him.

358.     Another contract attorney whom was very talkative also distracted Kalyn Stephens, Plaintiff. The contract attorney who is a female on several occasions suggested that Brian Ceballo engage in a romantic affair with one of the firm's female associates and talked about arranging a nonprofessional relationship between Brian Ceballo and the subject employee. Plaintiff was also offended when the female contract attorney kissed a recruiter from a staffing agency on the cheek during a subsequent matter.

72

359.    On multiple days, Christina Wilson requested via Plaintiff's personal e-mail and announcements at work that Plaintiff not return to work although Plaintiff had expected to work on those days.

360.    Less than a week after Plaintiff stopped working on the case and began working on another matter at another firm, Shearman & Sterling's staffing agency Hudson Global contacted Plaintiff multiple times to complain regarding trivial matters. At no other time (including the time Plaintiff actually worked on the Shearman & Sterling matter) did Hudson Global contact Kalyn Stephens, Plaintiff. This distracted Plaintiff as she worked on her new case.

361.    For example, during a phone call, Hudson Global told Plaintiff that Christina Wilson stated that she [Plaintiff] left work early on her last day of work. Plaintiff replied that she [Plaintiff] was one of the last people to leave work on that day, indicating that Christina Wilson's accusation against her was false. Plaintiff could not believe that this was happening.

362.    While working on the Shearman & Sterling document review matter, other contract attorneys reported to Plaintiff that the firm's associate Christina Wilson who is white was not admitted to the bar. Also during that time, another contract attorney who is black complained to Plaintiff that Christina Wilson demanded that he change his work hours on his timesheet, suggesting that he over reported the hours that he worked. The contract attorney told Plaintiff that he refused to change his timesheet. On multiple days, Plaintiff observed the contract attorney working diligently unlike many of the other contract attorneys, including Brian Ceballo and the female contract attorney whom engaged in inappropriate and unprofessional conduct.

**Sullivan & Cromwell Attorneys including Supervisors (Repeat and New Offenders) Subject Plaintiff Kalyn Stephens to an Offensive, Hostile and Intimidating Work Environment again because of Plaintiff's sex, religion, sexual orientation, gender, national origin, race, ethnicity, harassment and discrimination complaints - Hanover**

**Senior Associate Anastasia Angelova Harasses Ms. Stephens again**

363.      On or around October 7, 2005, Ms. Stephens began to work on document review matter
for the Hanover Insurance Group at Sullivan & Cromwell LLP's headquarters. As Ms. Stephens
was leaving work one night, associate Anastasia Angelova who was walking towards her greeted
her. Ms. Stephens did not respond because she was still upset that Anastasia Angelova had
harassed her and repeatedly retaliated against her, including firing her. Anastasia Angelova
immediately greeted Ms. Stephens again in a raised voice. Ms. Stephens greeted her back with
reservation.

364.      On a subsequent day, Anastasia Angelova, whom had exited the elevator with her
subordinate Alain Personna whom Ms. Stephens complained regarding his sexual harassment of
her during the Willis Group project, which Anastasia Angelova failed to remedy. Anastasia
Angelova walked aggressively towards Ms. Stephens causing her to move swiftly out of the way
in order to avoid getting run into. Anastasia Angelova did not greet Ms. Stephens at that time or
say anything to her.

365.      On a different day and as Ms. Stephens visited the store in the building lobby of Sullivan
& Cromwell LLP's headquarters, Anastasia Angelova entered the store after Kalyn Stephens,
Plaintiff. Anastasia Angelova walked to the counter where Ms. Stephens had been standing,
stood very close to her, and slammed a pack of cigarettes on the counter while narrowly avoiding
physical contact with Ms. Stephens' arm and hand. This, too, made Ms. Stephens very upset.

### Sullivan & Cromwell Contract Attorney Peter Fish Harasses Ms. Stephens again

366.      Also during the Hanover project, Sullivan & Cromwell contract attorney Peter Fish
whom had previously invited Ms. Stephens on several dates continued to approach her and again
asked her on multiple dates, additional thinly veiled solicitations for sex. During the beginning of
the Hanover document review project, Ms. Stephens deliberately chose to sit in a seat on an
opposite side of the case room to avoid Peter Fish's harassment of her but with no avail.

367.     For instance, as Ms. Stephens walked swiftly to her work table to escape Peter Fish, he walked aggressively towards her and invited her on a date. On another occasion, Peter Fish approached Ms. Stephens again and invited her on a date and during that time in the case room, he told her as he had told her during a previous Sullivan & Cromwell project: "You're quirky."

368.     On a different day, and on a different floor of Sullivan & Cromwell LLP's office, Peter Fish approached Ms. Stephens as she walked and again asked her on a date. This made her feel uncomfortable and made her feel as if she was being watched. Peter Fish's harassment of Ms. Stephens ended when he stopped working on the Hanover matter.

**Sullivan & Cromwell Partner Stephen Ehrenberg Harasses Plaintiff Kalyn Stephens**

369.     Around this time and on several occasions, partner Stephen Ehrenberg greeted Ms. Stephens multiple times throughout the workday for several days as he stood outside of the Hanover case room near the doorway as Ms. Stephens entered and exited the case room for her special projects and breaks. For example, when Ms. Stephens exited the case room to take a break and as she walked near the outside entrance of the door, Stephen Ehrenberg who was standing on the opposite side of the door greeted her. When Ms. Stephens returned just moments later, Stephen Ehrenberg greeted her again. Uncomfortably, Ms. Stephens greeted him back and continued walking to her work seat. This occurred several days.

370.     On other days as Ms. Stephens used the copy machine located outside the case room door during her special projects, Stephen Ehrenberg greeted her repeatedly. Ms. Stephens believes that she was being watched. This caused her to feel uncomfortable.

**Sullivan & Cromwell Contract Attorney Dylis Harasses Plaintiff Kalyn Stephens**

371.     Around this time, Sullivan & Cromwell contract attorney Dylis whom regularly communicated with Peter Fish continued to subject Ms. Stephens to harassment. For instance, Dylis without Ms. Stephens' consent, aggressively and harshly rubbed her hand through Ms. Stephens' hair causing Ms. Stephens to feel extremely uncomfortable.

372.     Dylis who sat in the same row of seats with Ms. Stephens and in the work seat next to her regularly stared at Ms. Stephens intensely, critiqued her attire, probed her and asked her personal questions on a near-daily basis. This is in addition to the dancing Dylis did in her work seat, which also distracted Kalyn Stephens, Plaintiff.

373.     On one occasion, Dylis, whom regularly took dinner breaks in the cafeteria as Ms. Stephens, remarked while staring at Ms. Stephens with contempt, "Kalyn, doesn't like to talk when she eats."

374.     Ms. Stephens regularly wore her personal headset and listened to CDs as a barrier to the ongoing near-daily harassment and distractions. However, Dylis continued to subject Ms. Stephens to harassment.

375.     For instance, although Ms. Stephens had routinely used her CD player to listen to music, Dylis insisted that Ms. Stephens download CDs on the work computer. For instance, on two occasions Dylis sat very close to Ms. Stephens and aggressively began using Ms. Stephens' work computer mouse to show her how to download music on the computer, which Ms. Stephens had no interest. Ms. Stephens felt even more uncomfortable when she could not remove her CD disk from the work computer, and did not retrieve it at anytime. No one intervened although Sullivan & Cromwell supervisors Kevin Lencki, Tod Theise, and Travis were usually present in the case room.

376.     On several days, Dylis also made Ms. Stephens feel uncomfortable when she routinely greeted Ms. Stephens in the case room upon Ms. Stephens' arrival to work in the morning. Ms. Stephens who felt uncomfortable by Dylis' unwanted attention of her and in the presence of supervisors in the case room did not greet Dylis back as Dylis repeatedly greeted her one morning. However, Ms. Stephens continued to communicate with Dylis regarding work-related matters. This includes when Dylis relayed work-related communications to her. This occurred as Sullivan & Cromwell staff attorneys including Kevin Lencki, Tod Theise, and Travis were present in the case room.

377.    Sullivan & Cromwell supervisors were usually present in the case room and during the morning when Ms. Stephens did not greet Dylis back. Ms. Stephens believes that Sullivan & Cromwell supervisors conspired with Dylis to subject Ms. Stephens to unwanted and unwelcomed attention of her because among other things, Sullivan & Cromwell supervisory attorney Kevin Lencki whom had repeatedly probed and asked Ms. Stephens personal questions, told Ms. Stephens: "Talk to Dylis." Ms. Stephens had no interest in talking to Dylis.

378.    In addition, on one occasion, Ms. Stephens' supervisor Travis asked Ms. Stephens to relay a work-related matter to Dylis. Although Dylis had repeatedly made Ms. Stephens feel uncomfortable, she relayed the message to her, as Travis was her supervisor. When Dylis returned to the case room, Ms. Stephens relayed the message in Travis' presence. Travis was sitting in his seat and not working. Dylis while staring at Ms. Stephens with contempt responded to her with hostility. Ms. Stephens resumed listening to her music because it was soothing.

379.    During a dinner break, contract attorney Anna whom Ms. Stephens routinely dined with in Sullivan & Cromwell LLP's cafeteria detected that something was wrong her. Ms. Stephens told Anna. Anna responded by stating: "She [Dylis] does not look like a very nice person." This was the extent of Ms. Stephens' harassment complaint with Anna. Dylis' harassment of Ms. Stephens ended when Dylis did not return to work on the Hanover matter.

**Sullivan & Cromwell Supervisory Attorney Travis Offends**

380.    Ms. Stephens also felt uncomfortable during staff attorney Travis' communications with staff attorney Lina, whom had recently been promoted from contract attorney and whom regularly visited the Hanover case room. Staff attorney Travis often communicated with staff attorney Lina in an unprofessional and inappropriate manner. For instance, on several occasions when staff attorney Lina visited the case room, staff attorney Travis replied to her comments: "Oh Lina," in an improper manner. In addition, staff attorney Travis lunged at staff attorney Lina and held his hands out to embrace her.

77

381.    Ms. Stephens also found staff attorney Travis' body language inappropriate when she stood near him.  For instance, several times when Ms. Stephens asked Travis to sign her timesheets, Travis would slowly raise his arm and quickly lower it as Ms. Stephens stood near him, causing Ms. Stephens to feel intimidated.

382.    Ms. Stephens also felt uncomfortable, when on several occasions, she saw staff attorney Travis in other areas in the building and he often laughed at her uncontrollably, as she walked near him.

**Sullivan & Cromwell Supervisory Attorney Kevin Lencki Harasses Ms. Stephens again**

383.    During Ms. Stephens' first week on the Hanover project, Ms. Stephens was sitting at her work table when staff attorney Kevin Lencki entered the Hanover case room, approached her, kneeled very close to her, and began a conversation by telling her: "They fired Mark." Ms. Stephens believes Kevin Lencki told her this because he was aware that Mark, Sullivan & Cromwell attorney and Ms. Stephens' supervisor during a previous project, had subjected her to sexual harassment and retaliation (as discussed in greater detail above), and that he was suggesting that his mistreatment of her was wrong and he would not subject her to that type of mistreatment (Kevin Lencki who was not her direct supervisor at that time greeted her during the subject project and this, too, caused her to feel as if she was being watched.)

384.    In addition, Kevin Lencki told Ms. Stephens that contract attorney Adam had been fired for saying "something to the wrong person" and that Klaus Rice had been fired from the Barclays project.  Ms. Stephens is aware that Klaus Rice had worked for Sullivan & Cromwell LLP after they both had been fired from the Willis Group project because in or around the summer of 2005, Klaus Rice complained again that associate Anastasia Angelova had fired them and also told Ms. Stephens that she [Ms. Stephens] had lost weight.

385.    Kevin Lencki also stated, "They [the firm] told me I cannot lead a team." Ms. Stephens who was shocked replied, "Did they really say that?" Ms. Stephens found the language, tone, and

message offensive and inappropriate. Ms. Stephens believed that Kevin Lencki approached and shared information with her because he wanted to establish a close relationship with her.

386. Kevin Lencki also asked Ms. Stephens where she had worked [since Anastasia Angelova had retaliated against her during the Willis Group project and also when the firm hired him for a full-time permanent position and even then he subjected Ms. Stephens to harassment and retaliation]. Ms. Stephens replied: "I worked for Cravath [Swaine & Moore LLP]."

387. On another day, Kevin Lencki approached Ms. Stephens in the case room and asked her if Anastasia Angelova spoke to her. Ms. Stephens believes he asked her this because he witnessed Anastasia Angelova subject her to extreme and outrageous behavior and discriminate against her during the Willis Group project.

388. During another time, Kevin Lencki approached Ms. Stephens in the case room and kneeled very close to her while telling her that the firm had changed the staff attorneys work title to 'Legal Analyst'. Ms. Stephens believes he told her this because she had complained about the staff attorneys' job title during the Willis Group project. Kevin Lencki also told Ms. Stephens that he paid off his student loans, suggesting that his full-time permanent position at the firm facilitated in the payment of his debt. Kevin Lencki also told Ms. Stephens about his benefits at the firm.

389. On another day, Kevin Lencki approached Ms. Stephens and began probing her and asking her questions about her purse and telling her about a purse that he wanted to purchase his daughter for Christmas. As Kevin Lencki was leaving her work area, he touched Ms. Stephens' purse without her consent. This caused Ms. Stephens to become very upset because his touching was unwanted and unwelcomed.

390. On several days, Kevin Lencki sat at an adjacent table near Ms. Stephens and stared at her for prolonged periods. He approached Ms. Stephens during other times.

**Another Sullivan & Cromwell Supervisory Attorney Harasses Plaintiff Kalyn Stephens**

391.    As Ms. Stephens was returning to the case room on one occasion, another Sullivan & Cromwell supervisor who managed an adjacent case room stopped her and told her his friend Nick liked her and had a "crush" on her. The Sullivan & Cromwell supervisory attorney also expressed to her that he told his friend during the times Ms. Stephens walked pass his case room: "There goes your girl." Ms. Stephens had to pass by his case room as she walked near or away from the Hanover case room. Ms. Stephens had previously visited his case room regarding the matter she worked. The unwanted and unwelcomed attention of her made her feel uncomfortable.

392.    Although Ms. Stephens did not reply to the comments, the Sullivan & Cromwell supervisory attorney and his subordinate Nick visited the case room where Ms. Stephens worked and he instructed his friend to sit next to Ms. Stephens, causing her to feel extremely uncomfortable. The supervisors in the case room witnessed this incident but did nothing.

**Sullivan & Cromwell Staff Attorney Georgia Maratheftis Harasses Ms. Stephens again**

393.    Around this time, Sullivan & Cromwell supervisor Georgia Maratheftis, whom regularly visited staff attorney Kevin Lencki in the case room, subjected Ms. Stephens to routine staring as she walked near Ms. Stephens and exited the case room. At some point, Georgia Maratheftis began to occupy a seat next to Ms. Stephens at the work table. This occurred several days and on all days, Georgia Maratheftis did not perform any work. Ms. Stephens believes this was orchestrated to annoy her because among other things Georgia Maratheftis did not choose one of many vacant seats on different rows, she had harassed Ms. Stephens and repeatedly retaliated against her during the Willis Group project, and had even acknowledged that Ms. Stephens liked having her space.

394.    Ms. Stephens also felt uncomfortable while signing for her car service, Georgia Maratheftis without reservation looked to obtain the information Ms. Stephens wrote. Ms. Stephens believes she did this to obtain personal information regarding her, including her home address.

**Sullivan & Cromwell Attorney Alain Personna Harasses Plaintiff Kalyn Stephens again**

395.     Around this time, Alain Personna occupied a seat at an adjacent work table and turned around in his seat for a prolonged period on multiple days and constantly smiled and subjected Ms. Stephens to unwelcomed staring of her.  During the multiple times Ms. Stephens saw Alain Personna in the cafeteria, Alain Personna also stared at her.  Later, he and Georgia Maratheftis visited the Hanover case room several times and stood in the doorway and obstructed the entry during Ms. Stephens' exit and entry.

396.     For example, as Ms. Stephens exited the case room to take a break, Alain Personna stopped her to greet her.  Uncomfortably, Ms. Stephens greeted him back with reservation.  On the way back to the case room, Alain Personna and Georgia Maratheftis were still standing in the doorway, causing Ms. Stephens to narrowly miss touching them when she returned.

**Sullivan & Cromwell Attorney Mahesha Mitchell Harasses Plaintiff Kalyn Stephens again**

397.     Additionally, on one day, Sullivan & Cromwell attorney Mahesha Mitchell who did not work in the Hanover case room visited staff attorney Georgia Maratheftis during a time Georgia Maratheftis occupied a seat next to Kalyn Stephens, Plaintiff.  As Mahesha Mitchell spoke to Georgia Maratheftis regarding Anastasia Angelova's alleged Christmas party, Mahesha Mitchell stood directly and very closely behind Ms. Stephens, hovered over her, obstructed her movement while staring at her and even looking in her purse.  This lasted for several minutes.

398.     The following morning and upon arriving to work, Ms. Stephens moved her seat again and this time, Ms. Stephens moved her seat to an opposite side of the case room near Sullivan & Cromwell staff attorney Ramses Cordova, whom had probed her and asked her personal questions.

399.     Additionally, Ramses Cordova had regularly complimented Ms. Stephens' attire, causing her to feel uncomfortable.  He had also asked Ms. Stephens the reason she had moved her seat.

**Sullivan & Cromwell Associate Laura Harasses Plaintiff Kalyn Stephens**

81

400.     Laura, one of several white associates at Sullivan & Cromwell LLP, did not work while seated near Ms. Stephens during her visits to the case room but instead observed Kalyn Stephens, Plaintiff. For example, as Ms. Stephens worked, Laura asked her: "Are you still working on your assignment?" suggesting that she was annoyed and making Ms. Stephens feel as if she was being watched. This constitutes the first and only communication Laura had with Kalyn Stephens, Plaintiff. Ms. Stephens who was still working responded: "Yes." When Ms. Stephens finished her review of documents, she told Laura whom had remained seated in a chair and a computer near her the entire time: "I finished."

401.     Ms. Stephens was the only person Laura singled out. The other case room employees whom among them were all male, consisting of contract attorneys and mostly full-time Sullivan & Cromwell staff attorneys and Ms. Stephens' supervisors including Kevin Lencki, Tod Theise, and Travis whom were all white, and very seldom worked in the case room where they spent a lot of hours. They were not subjected to this type of treatment.

### Sullivan & Cromwell Staff Attorney Tod Theise Harasses Plaintiff Kalyn Stephens

402.     When Ms. Stephens first began working in the Hanover case room, Tod Theise who occupied a work seat near Ms. Stephens' row, and who was relatively quiet began on one day to talk incessantly to his friend and staff attorney Kevin Lencki and staff attorney Travis regarding his wife's physical appearance, stating among other things that she was 5 foot 10, ran marathons and was from Zambia. In the third seat Ms. Stephens had moved, Tod Theise approached Ms. Stephens repeatedly and told her on several days: "You dress well" and "You dress very well."

403.     On several days, Tod Theise repeatedly approached Ms. Stephens as she sat in her work seat and stood very close to her. This caused her to feel extremely uncomfortable.

404.     This also occurred when Tod Theise began showing Ms. Stephens pictures of his wife. This is in addition to the huge picture of his wife displayed as a screensaver on his work computer. The screensaver that displayed Tod Theise's wife was visible a lot. Ms. Stephens was

offended when during perusing pictures of Tod Theise's wife that he showed her, Ms. Stephens saw a topless photo of Tod Theise's wife in which she wore only a pair of panty.

405.    Tod Theise also asked Ms. Stephens her age among other things, which made Ms. Stephens feel uncomfortable.

406.    Several times as Ms. Stephens listened to her music, Tod Theise approached Ms. Stephens whom sat in a work seat several rows away from his work seat and interrupted her by engaging her in non-work related topics, including his marriage, his wife and on-line shopping. Several times, as Ms. Stephens wore her headset, Tod Theise summoned her away from her work table to show her online merchandise. Ms. Stephens also felt very annoyed when Tod Theise on several occasions approached and asked her opinions regarding his attire. For example, he repeatedly made hand gestures at his body to suggest that Ms. Stephens look at his body.

407.    In addition, Theise approached her and gave her a bottle of wine as a gift, which Ms. Stephens uncomfortably accepted.

### Sullivan & Cromwell Supervisory Attorney Ian McLaine Discriminates Against Plaintiff

408.    When Ms. Stephens moved to another seat constituting one of many seats she had moved, Ian McLaine asked the reason.

409.    Ms. Stephens felt uncomfortable when on multiple days Ian McLaine approached her in other areas of Sullivan & Cromwell LLP's office and asked if she was returning to work the next day. Each time, Ms. Stephens indicated that she had planned to return the next workday.

410.    Ms. Stephens also felt uncomfortable when on a Saturday, Ian McLaine visited the case room to place food orders. At that time, he brought a food menu and gave it to Ms. Stephens to browse. When Ms. Stephens selected an item, Ian McLaine told her to select another item from the menu and did not order the food Ms. Stephens selected. He did not subject anyone else to this type of treatment. Ms. Stephens was also discriminated against during other days because unlike Sullivan & Cromwell permanent full-time attorneys, she did not have the option to order food

83

from an outside vendor every workday. Instead, she ate meals in the firm's cafeteria, where other Sullivan & Cromwell employees subjected her to leering of her.

411.     On another day, Ian McLaine visited the case room and began speaking incoherently while slurring his words. This also caused Ms. Stephens discomfort.

412.     On a later date, Ian McLaine visited the case room and announced that the Hanover project was ending, and provided an end date. On or around February 3, 2006, as Ms. Stephens was leaving for her last day of work on the Hanover matter, Ian McLaine approached her and while walking aggressively towards her, asked her if she wanted to stay. Also during that time, Tod Theise, whom had regularly approached Ms. Stephens, was also standing close to her and staring at her. Ms. Stephens who felt uncomfortable kept walking with her box of CD disks and CD player and did not return to work on the Hanover matter at Sullivan & Cromwell LLP. No one from Sullivan & Cromwell or Update Legal attempted to contact Ms. Stephens to address the reasons for her departure.

Simpson Thacher & Bartlett LLP Subjects Plaintiff to an Offensive, Hostile and Intimidating Work Environment because of Plaintiff's sex, religion, sexual orientation, gender, race, harassment and discrimination complaints and retaliates

413.     In 2006, Sullivan & Cromwell LLP's staffing agency De Novo Legal recruited Plaintiff to work for the law firm of Simpson Thacher & Bartlett. In or around Spring 2006, Plaintiff began to work on an insurance document review matter for Simpson Thacher & Bartlett, where she worked in a case room with several minority attorneys who were also temporary employees like her unlike the firm's associates whom were supervisors and disproportionately white males. Plaintiff worked on the document review matter in the basement of Simpson Thacher & Bartlett and in a case room with no windows and no supervision.

414.     Contract attorney Keven McDonald regularly probed Plaintiff and asked her questions. When discussing her recent work experiences, Plaintiff had indicated that she worked for S&C.

Keven McDonald emphasized that he "can not stand" S&C senior staff attorney Dawn Samuel and criticized the favoritism that Dawn Samuel exhibited against him when she worked as his supervisor at S&C.

415.     Another contract attorney whom also occupied a work seat in the case room discussed his experience at S&C. He told Plaintiff that S&C associate Anastasia Angelova reacted to the contract attorneys by stating: "They have cell phones," suggesting that Anastasia Angelova's criticism was unwarranted.

416.     In addition, he told Plaintiff that S&C sent Anastasia Angelova away, suggesting that S&C detected that its senior associate Anastasia Angelova was problematic and indicating this occurred before Plaintiff had worked with Anastasia Angelova. Plaintiff had expressed in the Simpson Thacher & Bartlett case room: "I had a lot of problems with Anastasia."

417.     Around this time, Plaintiff felt uncomfortable when contract attorney Jill Chenault whom she had worked with at S&C and whom occupied a work seat in the Simpson Thacher & Bartlett case room talked incessantly in the case room about sex. More specifically, Jill Chenault talked about the sex that she had had with multiple partners, boasted about the "big penis" of at least one of her sex partners and provided even more graphic details regarding the reputation and her sexual experience with multiple sex partners. Jill Chenault also talked about observing her parents have sex. Jill Chenault's offensive discussions also occurred in the presence of other case room employees.

418.     Plaintiff also felt uncomfortable when she was alone in the bathroom with Jill Chenault, including the time when Jill Chenault struck up a conversation in an attempt to gossip about another Simpson Thacher & Bartlett employee. Plaintiff did not reply because she had no interest. During another time, Plaintiff was offended when Jill Chenault repeatedly invited her to go to a social event in the office. Finally, Plaintiff responded: "I was not invited." Plaintiff did not attend the social event. During other times, Jill Chenault and contract attorney Flor Melgar invited Plaintiff to trips to the nail salon. Plaintiff declined because among other things both

85

female attorneys exhibited inappropriate and unprofessional conduct in the case room, causing Plaintiff to feel uncomfortable.

419.    This includes but not limited to routine, excessive personal phone calls that Jill Chenault and Flor Melgar received and made in the case room. Plaintiff had answered several incoming personal phone calls in the case room regarding Flor Melgar. Plaintiff relayed numerous phone messages to Flor Melgar.

420.    Contract attorney Aaron Rosenberg who occupied a work seat in the case room prior to his promotion to a full-time permanent position at the firm complained that he was answering several incoming phone calls for Jill Chenault. Plaintiff observed that the incoming phone calls for Jill Chenault occurred on a different phone in the case room.

421.    Aaron Rosenberg, who is a white male, was promoted from contract attorney to associate at the firm. Upon information and belief, Aaron Rosenberg is one of three white male contract attorneys at Simpson Thacher & Bartlett who was promoted from contract attorney to associate attorney. Plaintiff did not interact with or observe any black associates at the firm.

422.    During one afternoon, as Jill Chenault sat alone in the case room with Plaintiff, Jill Chenault repeatedly asked Plaintiff among other things: "Why are you so quiet?" Plaintiff responded: "Some people are quiet." Jill Chenault persisted and shortly thereafter asked her: "Did someone tell you to be that way?"

423.    Jill Chenault also subjected Plaintiff to unwanted and unwelcomed attention of her in other areas of the firm's office, including Simpson Thacher & Bartlett's cafeteria, where the firm's employees subjected Plaintiff to unwanted leering.

424.    This is in addition to the sexual harassment that Simpson Thacher & Bartlett's contract attorney Thomas Haggerty subjected Kalyn Stephens, Plaintiff. On several days, Thomas Haggerty invited Plaintiff to have drinks, and repeatedly invited Plaintiff to have drinks with him and De Novo Legal's staffing agent Sean Curtin, all thinly veiled solicitations for sex. Plaintiff

declined.  Plaintiff still finds this reprehensible, repugnant, offensive, and insulting among other things.

425.     On several days, Thomas Haggerty talked about his close ties with De Novo Legal's agent Sean Curtin.  Plaintiff believes Thomas Haggerty did this to influence her to spend time with him.  This is in addition to Thomas Haggerty repeatedly asking Plaintiff to discuss things she liked to do on dates.

426.      In addition, Plaintiff felt uncomfortable when Thomas Haggerty told her that the firm's partner fired a female contract attorney whom he discovered was working simultaneously on a Simpson Thacher & Bartlett project and another matter.

427.     On one occasion, Thomas Haggerty had addressed Plaintiff using her middle name. Plaintiff feels as if she was being watched.  She had not told Thomas Haggerty her middle name. She did not respond because she did not want to encourage his inappropriate behavior.

428.     During other times, Thomas Haggerty repeatedly invited Plaintiff to Federalist Society events with him, suggesting that she should go because she expressed conservative viewpoints. In an attempt to rebuff the offensive office behavior, Plaintiff expressed her conservative Christian viewpoints on several occasions in the presence of Thomas Haggerty and Simpson Thacher & Bartlett employees in the case room.

429.     Contract attorney Flor Melgar, who is Hispanic, told Plaintiff out of the presence of Thomas Haggerty: "Tom likes you."  On a different day, Flor Melgar told her: "What about you and Tom?" suggesting that Plaintiff engage in a romantic affair with Thomas Haggerty.  This caused Plaintiff to feel uncomfortable.  In addition, Flor Melgar told Plaintiff: "You need to get out."  She repeatedly criticized Plaintiff's conservative views and lifestyle.

430.     During other times, Keven McDonald caused Plaintiff to feel uncomfortable by probing her including but not limited to expressing: 'I expect an attractive young lady like you to be dating a lot.'  On a different day, Keven McDonald told her: "Tom likes you."  In addition, he

stated: "What about you and Tom?" Plaintiff is aware that Keven McDonald formed an alliance with Thomas Haggerty because she saw the pair together outside the office during her break.

431.     Plaintiff knows Keven McDonald formed an alliance with contract attorney Jill Chenault because Keven McDonald regularly communicated with Jill Chenault in the case room, outside of work, and over the phone, as the two discussed in the case room. Plaintiff also felt uncomfortable when during other areas on the work floor, Keven McDonald subjected Plaintiff to unwanted and unwelcomed attention of her by stopping her in other areas of the building multiple times and attempted to strike up non-work related conversations with her. This occurred as Plaintiff returned to the case room from her breaks.

432.     Plaintiff also felt extremely uncomfortable when Keven McDonald and Thomas Haggerty repeatedly discussed Simpson Thacher & Bartlett contract attorney Karen's reaction to their harassment of her. This occurred repeatedly on several days. Karen is black, a Harvard law graduate, and Staten Island native who worked for Cravath Swaine & Moore LLP prior to working as a contract attorney for Simpson Thacher & Bartlett during a project with Keven McDonald, Thomas Haggerty and other case room employees. Upon information and belief, Karen complained to Simpson Thacher & Bartlett's management and it separated her and individually separated the contract attorneys whom she worked including Keven McDonald and Thomas Haggerty. This occurred before Plaintiff worked with Keven McDonald and Thomas Haggerty. Keven McDonald and Thomas Haggerty repeatedly subjected Karen to criticism, including but not limited to labeling her "crazy." Their conversations regarding contract attorney Karen intensified. This too bothered and distracted Kalyn Stephens, Plaintiff. The unprofessional and inappropriate conduct caused Plaintiff to feel extremely uncomfortable and distracted her.

433.     Several times, Keven McDonald discussed his close ties with Simpson Thacher & Bartlett's staff attorney Mickey, indicating that he [Keven McDonald] had communicated with him regarding case room issues. For example, when Plaintiff did not acquiesce to the unwanted

and unwelcomed attention of her, Keven McDonald stated: "I'm going to tell Mickey," implying that he could alter the terms and conditions of Plaintiff's employment to her detriment. Plaintiff felt as if her employment was threatened. Plaintiff believes Keven McDonald did this to exert influence over her. Plaintiff had not met supervisory attorney Mickey or knew of his existence. Another contract attorney stated: "They usually make an example out of somebody," and urged Plaintiff to stay "under the radar." Plaintiff still believes the statements were made to prevent her from complaining.

<u>Thomas Haggerty Subjects Plaintiff to Unwanted Physical Touching</u>

434.    Although Plaintiff had declined Thomas Haggerty's requests for dates, Thomas Haggerty touched her leg. In the presence of case room employees, Plaintiff yelled at him: "Don't touch my leg." As a result, Plaintiff moved her seat to an end seat close to the wall to escape him. The following ensued:

435.    Flor Melgar criticized Plaintiff more by stating to another co-worker while staring at Plaintiff: "You can tell she [Plaintiff] doesn't have a personality because of where she is sitting." (This occurred after Plaintiff moved her seat and decreased her communications.)

436.    On several days, Flor Melgar openly discussed her bisexual lifestyle, including but not limited to her romantic affairs with women and men, whom regularly called the case room. In addition, Flor Melgar repeatedly followed Plaintiff into the bathroom.

437.    For instance, as Plaintiff was walking in the case room toward the door exit, Flor Melgar exited her seat and followed Plaintiff into the bathroom. This occurred multiple times. In addition, Flor Melgar repeatedly reported Plaintiff's bathroom activities to other case room employees in Plaintiff's presence. This is in addition to the multiple times that Flor Melgar subjected Plaintiff to staring and other unwanted and unwelcomed attention of her.

438.    In addition, Keven McDonald who is very tall and a former basketball player, and at least 15 years old older than Plaintiff, approached Plaintiff in her work seat and stood extremely close

to her while berating her and making a false accusation against her. This caused Plaintiff to feel intimidated and made her very upset. Plaintiff screamed at him. Keven McDonald returned to his seat. Several employees in the case room witnessed this. Jill Chenault responded: "She told you."

439.    Keven McDonald continued to subject Plaintiff to ridicule by falsely accusing her of printing on the firm's printer from her home. Several mornings, when Plaintiff arrived to work she removed the fan that was not in use to place her purse. This occurred in the morning and during times Plaintiff was alone with Keven McDonald in the case room. When other employees arrived to work, Keven McDonald repeatedly criticized Plaintiff for removing the fan.

440.    In addition, Plaintiff was offended by multiple conversations that the majority of case room employees engaged. For instance, the contract attorney whom sat in an end seat on the opposite side of Plaintiff's work seat began discussing his marijuana use. Keven McDonald who sat next to him discussed his marijuana use; Jill Chenault who sat on the same row as Keven McDonald and close to the exit discussed her marijuana use; Thomas Haggerty whom occupied a seat on Plaintiff's row but closer to the door exit and near Jill Chenault discussed his marijuana use; and the female contract attorney whom sat next to Plaintiff discussed her marijuana use. Plaintiff who found the discussions inappropriate and unprofessional did not respond.

441.    On another day, in the same manner, the contract attorneys provided their horoscopes beginning with the contract attorney who occupied the work seat across from Plaintiff's work seat and ending with the contract attorney whom occupied the work seat next to Kalyn Stephens, Plaintiff. Plaintiff did not respond because she had no interest.

442.    In addition, Thomas Haggerty whom had previously told Plaintiff: "The partner will like you because you work a lot of hours" began criticizing the food Plaintiff ordered by criticizing her selection and complaining about the price, suggesting that it was expensive. Thomas Haggerty even told her to eat in the cafeteria, which was optional. This occurred several days.

443.   During other times, Thomas Haggerty who exercised during work hours, which is in addition to the other extended breaks that he routinely took, berated Plaintiff by repeatedly demanding on several days that she spend time out of the case room by telling her among other things "take a walk [outside]" and telling her that it was 'nice' outside. The manner and tone in which he spoke to her became increasingly demeaning. Plaintiff did not solicit Thomas Haggerty's advice or opinion. On multiple days, Thomas Haggerty's body odor also distracted Plaintiff.

444.   Plaintiff was also offended when Thomas Haggerty whom identified himself as Irish and Asian (and who, upon information and belief, has a Hispanic heritage) engaged in several conversations with Keven McDonald who is black regarding Simpson Thacher & Bartlett's black cafeteria employees. Thomas Haggerty and Keven McDonald made disparaging remarks regarding the cafeteria employees' physical appearance, including but not limited to stating that the employees had no teeth and stating that one employee appeared to have been in 'prison'. Plaintiff found these comments offensive and inappropriate. Another co-worker in the case room complained to Plaintiff that the conversations were "racist," suggesting that she too was offended. During another time, the same co-worker began complaining about a black Yale law graduate whom worked for a non-profit organization. Several times, she discussed the co-workers' discrimination against the black Yale law graduate.

445.   In addition, Jill Chenault criticized Plaintiff's phone calls with technical support regarding Plaintiff's computer issues, indicating Plaintiff should have been friendly during her phone calls.

446.   In addition, Keven McDonald whom often collected paychecks and/or pay stubs from De Novo Legal stopped collecting Plaintiff's paychecks and/or pay stubs. Additionally, Keven McDonald continued to collect the timesheets for signature by the firm's supervisors and stopped collecting Plaintiff's timesheet for signature. Plaintiff asked Keven McDonald where to get her timesheet signed. He told her and she began taking her timesheet to be signed by a Simpson

Thacher & Bartlett supervisor. Around this time, Plaintiff received several phone calls from recruiters, including Update Legal employment agency.

Simpson Thacher & Bartlett's Supervisors Offend

447.    Simpson Thacher & Bartlett associate Dan, a white male, visited the case room and discussed time sheet issues. During these discussions, he stared intensely at Plaintiff, as if she was the only person in the case room. Although he continued to stare intensely at Plaintiff as he spoke, Thomas Haggerty whom routinely took extended breaks (multi-hour breaks) which he did not deduct from his timesheets interjected by suggesting an electronic method to monitor employees' entry and exit.

448.    On other days, supervisor Dan subjected Plaintiff to unwanted and unwelcomed attention, including when he stared at her as she walked near him in other areas of the building and outside of the building. On one occasion, Plaintiff uncomfortably shared a car service ride with another associate, a white male, who talked incessantly about his girlfriend until he finally used his phone to contact her.

Simpson Thacher & Bartlett's Agents and Employees Retaliate

449.    Plaintiff was sitting in the case room when she observed Thomas Haggerty interact with a visitor. Next, Jill Chenault exited her work seat to meet with the visitor outside of the case room door. As Plaintiff returned from her break, the visitor Sean Curtin of De Novo Legal stopped her to speak with her and asked her if she was Kalyn Stephens, Plaintiff. Plaintiff responded in the affirmative. Sean Curtin began telling her: 'I have been getting a lot of complaints about you.' Plaintiff inquired. Sean Curtin indicated that the contract attorneys had complained about her. Plaintiff responded by telling him: "Tom touched my leg."

450.    When Plaintiff complained about Keven McDonald standing extremely close to her and screaming at her, Sean Curtin dismissed Plaintiff's concerns immediately by stating: "I have known Keven for [several] years, and he would not do anything like that."

92

451.     Sean Curtin threatened Plaintiff by telling her that Mickey, Simpson Thacher & Bartlett's
supervisory attorney would get mad and fire all of the contract attorneys if issues persist.
Plaintiff responded by stating that she did not do anything to warrant getting fired.  Sean Curtin
responded in a threatening tone: "I can fire you."

452.     This occurred around the time that Keven McDonald stood in the doorway of the case
room, and while staring at Plaintiff stated: "Somebody is going to get fired."  Plaintiff felt very
humiliated and did not believe that this too was happening in a professional environment.

453.     After her conversation with Sean Curtin, Plaintiff returned to the case room.  As Plaintiff
attempted to focus on work, she was disrupted by the loud noises that Thomas Haggerty made
with his teeth.  She believes it was deliberate.  She complained to her co-worker.  Her co-worker
stated that Thomas Haggerty probably wore dentures.  Another time, the co-worker responded by
stating: "I don't know who he knows," suggesting that she did not want to complain and subject
herself to retaliation.

454.     At some point, Plaintiff asked Thomas Haggerty to stop the noise because it became too
distracting.  Plaintiff had recalled a prior occasion when Thomas Haggerty talked about creating a
disturbance in his apartment building by creating noises on the floor to intentionally annoy his
neighbor.  Plaintiff believes his distracting behavior in the case room was also intentional.

455.     On a subsequent day, Thomas Haggerty approached the printer near Plaintiff's work seat
where she sat and began shaking the printer tray near Plaintiff's purse, which also began to shake
and almost fall.  Plaintiff believes he did this to subject her to emotional distress.  Plaintiff, who
was distracted and upset, screamed at him.  Thomas Haggerty responded by telling Plaintiff that
her purse should have not have been in that location.  Plaintiff responded by stating: "You should
have asked me to move it."  Jill Chenault began yelling at Plaintiff: "Listen up, Lil' girl."
Plaintiff yelled back at her: "Shut up.  I wasn't talking to you."  Next, Jill Chenault began telling
the female associate whom visited the case room and whom she had previously and multiple

times described as 'ugly', and while staring at Plaintiff: "Some people don't know how to communicate."

Simpson Thacher & Bartlett and De Novo Legal Fire Plaintiff Because She Complained

456.     On the following workday and when Plaintiff returned to work at Simpson Thacher & Bartlett location at 425 Lexington Avenue, she was stopped by security in the lobby whom contacted the firm. Simpson Thacher & Bartlett and De Novo Legal had fired Plaintiff with full knowledge that it is illegal to punish an employee for complaining of harassment and discrimination.

457.     Simpson Thacher & Bartlett's paralegal Steve whom periodically visited the case room told her in a condescending manner phased in a question that someone should have called her to inform her not to return to the firm. Next, Plaintiff expressed that she wanted to retrieve her personal property. Paralegal Steve left the lobby and returned with a box containing Plaintiff's CD disks.

458.     When Plaintiff left the building and checked her messages, she learned for the first time that she had multiple messages on her voice-mail left during the previous night. One message, which was blatantly false, emphasized that the project ended for everyone. Sensing that she had been subjected to a retaliatory firing, Plaintiff called the Simpson Thacher & Bartlett case room. Contract attorney Flor Melgar answered the phone in the case room. During another time, contract attorney Jill Chenault answered the phone in the case room.

459.     Plaintiff alleges that Simpson Thacher & Bartlett and De Novo Legal fired her because she opposed and refused to submit to the illegal conduct described herein. Plaintiff was very upset because the unlawful firing of her affected her financially. Plaintiff contacted a suicide hotline among other things.

Cravath Swaine & Moore LLP subjects Plaintiff to an Offensive, Hostile and Intimidating Work
Environment because of Plaintiff's sex, religion, gender, national origin, race, ethnicity, and
discrimination complaints

460.    During Summer 2006, Sullivan & Cromwell LLP's staffing agency Update Legal
        contacted Plaintiff regarding a contract attorney position at the law firm of Cravath Swaine &
        Moore. Update Legal informed Plaintiff that the law firm was conducting interviews. Plaintiff
        interviewed with Cravath Swaine & Moore's staff attorney Ronald Campbell and was offered a
        position as a contract attorney.

461.    Unlike previous contract attorney positions, Plaintiff was hired directly by the law firm.
        On or around July 10, 2006, Plaintiff began work on a document review matter at the firm.

462.    Initially, staff attorney Ronald Campbell worked as Plaintiff direct supervisor. Plaintiff
        occupied a work seat in a workroom of approximately twenty attorneys. Staff attorney Ronald
        Campbell regularly visited the workroom, where he provided instructions and made
        announcements. Ronald Campbell observed that Plaintiff regularly arrived early for work and
        left later than many of her co-workers. He commended her work ethic.

463.    Around this time, Ronald Campbell made an announcement that contract attorneys failed
        to record their extended breaks on their timesheets. Afterwards, one of the contract attorneys,
        Shelby Bauer, who is white, and whom sat on the same work row as Plaintiff and whom Plaintiff
        observed returning late from lunch, became upset and incessantly complained about staff attorney
        Ronald Campbell, who is black.

464.    Another contract attorney Phil, who is white, also began to criticize Ronald Campbell.
        Contract attorney Phil who sat in the same row of seats in the work seat next to Shelby Bauer and
        next to Plaintiff began to conduct an online search on his work computer regarding staff attorney
        Ronald Campbell's background. Contract attorney Phil expressed that he was conducting a
        search regarding the bar record of Ronald Campbell and to confirm Ronald Campbell's bar

95

registration and Harvard education, while making negative and critical comments regarding Ronald Campbell's professional credentials and attainment.

465.     Around this time, Shelby Bauer attempted to engage Plaintiff in their unwarranted criticisms, which Plaintiff found distracting and had no interest. For instance, on several days, Shelby Bauer struck up or attempted to strike up conversations with Plaintiff regarding Ronald Campbell's criticism of her late arrival from lunch, suggesting that Ronald Campbell's complaint was unwarranted. Shelby Bauer continued to pressure Plaintiff to take her side and accept her view. She had even asked Plaintiff if she [Shelby Bauer] was right. Plaintiff did not respond because among other things, Plaintiff observed Shelby Bauer and other contract attorneys return from lunch late and engage in other inappropriate and unprofessional behavior.

466.     Shortly thereafter, Shelby Bauer repeatedly announced that Ronald Campbell had been reassigned and/or removed from the document review matter at the firm. Eventually, Ronald Campbell stopped working as Plaintiff's direct supervisor. Staff attorney Alysa Mokas and Staff attorney Laurie Dolinger began to work as Plaintiff's direct supervisors.

Breach of Contract at Cravath Swaine & Moore LLP

467.     Cravath Swaine & Moore did not honor the terms of its employment contract with Kalyn Stephens, Plaintiff. For instance, the firm promised to provide car service rides. When Plaintiff was denied car service rides, she complained, including but not limited to sending an e-mail to the firm's administration.

468.     Plaintiff was also dissatisfied with the work conditions. The workroom had no air conditioning. The sizes and noises of the fans were distracting.

469.     In addition, Plaintiff narrowly avoided stepping on the gluey paper rat and/or mouse traps that lay on the floor near the row of seats where Plaintiff sat. There was minimal space that separated Plaintiff's work table and the wall where the rat and/or mouse traps lay.

470.     Also, the bathroom was filthy and inoperative multiple times, including the toilet.
         Plaintiff dreaded going to the bathroom.

Complaints of Unaddressed, Unethical Practices at Cravath Swaine & Moore LLP

471.     Multiple times, contract attorney Phil stood closely behind Plaintiff's seat and
         maneuvered it. This occurred as Plaintiff sat in a different seat during meetings.

472.     Contract attorney Phil whom regularly sat in the work seat next to Plaintiff repeatedly
         complained that another contract attorney did not accurately reflect his arrival and departure
         times from work on the sign-in / sign-out sheet. On multiple days, contract attorney Phil
         summoned Plaintiff away from her work seat to review the sign-in / sign-out times that the
         subject contract attorney recorded on the sign-in / sign-out sheet while notating the time the
         contract attorney arrived and departed from work.

473.     Another contract attorney whom sat in a work seat next to Plaintiff constantly typed on
         his computer while participating in instant messaging. Plaintiff who was distracted by the
         incessant typing and the loud noise on the contract attorney's keyboard repeatedly observed
         instant messaging on the contract attorney's computer screen. During several consecutive hours
         on multiple days, the contract attorney participated in online chatting, as Plaintiff worked.

Shelby Bauer Continues to Harass Plaintiff

474.     Over the course of several days, Shelby Bauer continued to subject Plaintiff to unwanted
         and unwelcomed attention, which distracted Kalyn Stephens, Plaintiff. Shelby Bauer whom sat
         on the same work row as Plaintiff berated Plaintiff by telling her to leave at an early time and not
         to utilize car service, which Plaintiff had complained about. In addition, Shelby Bauer repeatedly
         berated Plaintiff by telling her that she should work fewer hours.

475.     Also, Shelby Bauer whom sat two seats away from Plaintiff made unwarranted criticism
         regarding Plaintiff's online document review work. For instance, as Plaintiff reviewed online
         documents, Shelby Bauer repeatedly interrupted her and told her how to categorize documents.

This is in addition to telling Plaintiff whom regularly carried her gym bag to work that she should let her muscles rest. In addition, Shelby Bauer told Plaintiff that she should not "deprive" herself of certain foods. Plaintiff did not seek Shelby Bauer's advice or opinions.

476.     Shelby Bauer violated the firm's formal business dress policy. She routinely wore open toe flip flops at work. This is in addition to the other unprofessional conduct Plaintiff witnessed.

### Cravath Swaine & Moore Attorney Eric Harasses

477.     Attorney Eric, who occupied an end seat on the same row of seats as Plaintiff and Shelby Bauer, sent Plaintiff personal e-mails to her work e-mail address. On several days, he distracted Plaintiff by asking her if she had received his e-mails. Plaintiff did not reply to his e-mails because she had no interest in engaging in non-work related communications with him.

478.     However, attorney Eric continued to subject Plaintiff to unwanted and unwelcome attention. On multiple days, attorney Eric invited himself to lunch with Plaintiff. This occurred during moments Plaintiff walked near his work seat to exit the workroom and during times when Plaintiff sat at her work seat. Several times, attorney Eric trailed behind Plaintiff during her lunch break. He showed Plaintiff pictures of his black child whom was still an infant.

479.     In addition, attorney Eric emphasized that he liked gospel music. He also told Plaintiff that he attended a gospel event in Harlem. Plaintiff believes he told her this because he wanted to develop a close relationship with her. Plaintiff often listened to the radio and CD disks at work. However, she did not discuss her Christian background with attorney Eric, whom identified himself as Jewish.

480.     In addition, Plaintiff was offended when on several occasions, she walked passed attorney Eric's work seat to exit the workroom and he ogled at her body. Plaintiff found his conduct insulting, offensive, inappropriate and unprofessional among other things.

### Supervisory Attorney Alysa Mokas and Supervisory Attorney Laurie Dolinger Discriminate

481.     Staff attorney Alysa Mokas replaced Ronald Campbell's role on the document review
matter. Several times, Alysa Mokas provided announcements and directions regarding the
document review matter, which often changed. Several times, she reacted in a hostile manner to
Plaintiff's work-related questions and issues.

482.     For instance, when Alysa Mokas visited the workroom and Plaintiff expressed concerns
and/or asked questions regarding the document review matter, Alysa Mokas repeatedly
interrupted Plaintiff's speech. This is in addition to the times when Alysa Mokas and staff
attorney Laurie Dolinger hastily assisted Plaintiff regarding computer issues. On several days,
Plaintiff complained about computer issues that affected her ability to perform her work. Alysa
Mokas who is white and/or Jewish and Laurie Dolinger who is white and/or Jewish did not
subject other employees to hostile treatment.

483.     For instance, when attorney Eric whom is Jewish asked Alysa Mokas work-related
questions on several days and during times as Plaintiff, Alysa Mokas responded to him in a
professional manner. Alysa Mokas also singled out Plaintiff for discriminatory treatment when
she repeatedly entered the workroom and subjected Plaintiff to intense staring, although over
fifteen contract attorneys occupied seats in the workroom.

484.     Plaintiff was also offended when she approached Alysa Mokas to sign her timesheet and
Alysa Mokas made a very threatening hand gesture at Plaintiff and walked away. Alysa Mokas
did not react in a harsh manner to another contract attorney whom only seconds before, Plaintiff
observe approach Alysa Mokas and express that she needed her timesheet signed. Unlike
Plaintiff, the contract attorney is Caribbean. Plaintiff believes that she was the only African
American attorney. Chantel, a contract attorney, whom identified herself as African, walked near
Plaintiff as she sat in her work seat, and told her without provocation: "African Americans live in
the South."

Cravath Swaine & Moore's Unwarranted Criticism regarding Plaintiff's Work

485.     Multiple times, Alysa Mokas and Laurie Dolinger called Plaintiff into their work area and complained to Plaintiff that her work productivity was substandard, indicating that she needed to increase her document review rate. Alysa Mokas and Laurie Dolinger presented print outs of charts purporting to represent Plaintiff's work productivity.

486.     During other times, Alysa Mokas and Laurie Dolinger called Plaintiff into their office and indicated that her review rate increased or improved but complained that her accuracy was substandard. For instance, Alysa Mokas and Laurie Dolinger called Plaintiff into their office regarding categorization of a document. Plaintiff read and analyzed the document, and provided a succinct rationale. Laurie Dolinger responded: "I understand but I disagree." This occurred shortly before Plaintiff went away on a vacation.

487.     Around this time, Alysa Mokas followed Plaintiff onto the elevator. During the elevator ride, she complimented Plaintiff's clothing. Plaintiff succinctly replied, "Thank you." Then, Alysa Mokas nosily asked her: "Where are you going?" Plaintiff succinctly replied that she was getting food. Next, Alysa Mokas continued to harass Plaintiff by rudely asking her where she was getting food. Plaintiff whom had no interest in communicating with Alysa Mokas regarding non-work related matters provided another succinct response.

Cravath Swaine & Moore Continues to Retaliate

488.     On or around September 7, 2006, and less than a week after Plaintiff returned from a vacation, Alysa Mokas approached Plaintiff as Plaintiff sat in her work seat. Alysa Mokas kneeled close to Plaintiff and told her that she needed to go to Human Resources. Plaintiff asked her to provide a reason for why she needed to visit Human Resources. Alysa Mokas responded to Plaintiff by falsely stating: "It's nothing."

489.     Shortly thereafter, Plaintiff met with the firm's Human Resources Department who informed her that she was being terminated for poor work performance. The firm's Human Resources Department cited Plaintiff's accuracy and document review rate as the reasons.

490.     Plaintiff recalled the conversations that she had with the firm's staff attorney Alysa

Mokas and staff attorney Laurie Dolinger regarding her work performance. At times, the human

resources manager waivered by stating that Plaintiff was not being terminated for low work

productivity but for her accuracy. During another moment, she cavalierly stated Plaintiff was

being fired for low work productivity and not accuracy and then vice versa.

491.     Plaintiff informed the firm's Human Resources Department that Cravath Swaine &

Moore should be concerned with fraudulent billing. The human resources manager would not

allow Plaintiff to retrieve her personal property. Security escorted Plaintiff out of the building.

492.     Less than a week later, attorney Eric whom had subjected Plaintiff to unwanted and

unwelcomed attention at the firm contacted Plaintiff via telephone. Plaintiff who was home and

unemployed answered her cell phone. Attorney Eric asked Plaintiff the reason she had not

returned to work at the firm. Plaintiff responded: "They fired me." Attorney Eric asked the

reason. Plaintiff repeated the initial reasons Cravath Swaine & Moore's Human Resources

Department had given her regarding her accuracy and document review rate. Attorney Eric

replied that he believed Plaintiff had been fired because she was not admitted to the New York

bar, indicating the firm's proffered reasons were bogus. Plaintiff had disclosed to Cravath

Swaine & Moore and its staffing agency prior to her employment that she had not been admitted

to the New York bar, therefore, Plaintiff knew this was not the reason. Plaintiff indicated that she

wanted to end the phone call. Attorney Eric told her: "Call me if you need anything." Plaintiff

was without an income.

        Cravath Swaine & Moore Continues to Discriminate against Black Attorneys

493.     Within three months, another contract attorney whom is black and whom worked with

Plaintiff on the Cravath Swaine & Moore document review matter in a different case room

informed Plaintiff that Cravath Swaine & Moore had fired her shortly after the firm fired Kalyn

Stephens, Plaintiff.

                                        101

494.     During a subsequent time, another black attorney and Plaintiff's co-worker during the Cravath Swaine & Moore document review matter complained to Plaintiff that she and the rest of the black attorneys were fired during the same time and the firm had retained its white attorneys.

495.     Plaintiff's co-worker told her among other things that she suspected Cravath Swaine & Moore fired its black contract attorneys because it disapproved that "[Staff attorney] Ron [Campbell] hired too many black people." In addition, she told Plaintiff: "They do not like black people," indicating law firms do not like to hire black attorneys.

496.     During the conversation, Plaintiff inquired about the work status of the contract attorney whom is white and had occupied the work seat next to Plaintiff and engaged in excessive online chatting during the Cravath Swaine & Moore document review matter. Plaintiff's co-worker reported that she occupied a work seat near the subject contract attorney subsequent to Plaintiff's termination and that she had also observed the white male contract attorney engage in online chatting, suggesting that it was ongoing, routine, and excessive.

497.     Upon information and belief, the law firm of Cravath Swaine & Moore has no black partners.

**Sullivan & Cromwell Manager Aggressively Recruits Ms. Stephens to return to work at the Firm**

498.     Beginning in 2006, Sullivan & Cromwell's staffing agent Sandrene Ryan of De Novo Legal contacted Ms. Stephens and stated during the phone calls that Sullivan & Cromwell manager Tod Theise requested Ms. Stephens back to work at the firm. This occurred several times. Ms. Stephens had not worked for De Novo Legal at Sullivan & Cromwell LLP. Ms. Stephens had not worked on a matter with Tod Theise at Sullivan & Cromwell LLP. This shows that she was being talked about. This caused Ms. Stephens to feel very uncomfortable.

499.     Tod Theise had occupied a workspace in the Hanover case room where Ms. Stephens had been assigned (and harassed at Sullivan & Cromwell LLP as discussed above). Ms. Stephens felt